## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

|  |  |  |
|---|---|---|
| AL GHURAIR IRON & STEEL LLC, | ) | |
| *Plaintiff*, | ) | |
| v. | ) | |
| UNITED STATES, | ) | Court No. 20-00142 |
| *Defendant*, | ) | |
| and | ) | **PUBLIC VERSION** |
| UNITED STATES STEEL CORPORATION, NUCOR CORPORATION, and STEEL DYNAMICS, INC., | ) | |
| *Defendant-Intervenors*. | ) | |

### DEFENDANT'S RESPONSE TO PLAINTIFFS'
### RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

CLAUDIA BURKE
Assistant Director

Of Counsel:
ELIO GONZALEZ
Senior Attorney
U.S. Department of Commerce
Office of the Chief Counsel
    for Trade Enforcement and Compliance
Washington, D.C.

MOLLIE L. FINNAN
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044

April 14, 2021

*Attorneys for Defendant*

## **TABLE OF AUTHORITIES**

Statement Pursuant To Rule 56.2 ................................................................................. 2

    I.    The Administrative Determination Under Review .................................... 2

    II.    Issues Presented For Review ................................................................... 2

Statement Of Facts ....................................................................................................... 3

    I.    Initiation Of Circumvention Inquiry ....................................................... 3

    II.    Commerce's Preliminary Determination ................................................. 4

    III.    Commerce's Final Determination ........................................................... 6

Summary Of The Argument .......................................................................................... 11

Argument ...................................................................................................................... 12

    I.    Standard Of Review ............................................................................... 12

    II.    Legal Framework ................................................................................... 14

    III.    Commerce's Conclusion That AGIS's Assembly Or Completion Of CORE In The UAE Is Minor Or Insignificant Is Supported By Substantial Evidence And Not Contrary To Law ............................................................................. 17

        A.    The Level Of Investment In The UAE Is Minor ................................. 18

        B.    The Nature Of The Production Process And The Extent Of Facilities In The UAE Are Minor ................................................................... 27

        C.    The Value Added By Processing Steel Input Into CORE In The UAE Represents A Small Proportion Of The Value Of The CORE Imported Into The United States ................................................... 31

    IV.    Commerce's Use Of Surrogate Values In The Circumvention Analysis Is Supported By Substantial Evidence And Not Contrary To Law .......................... 37

    V.    Commerce Did Not Err In Its Consideration Of Pattern Of Trade ............................ 41

CONCLUSION .............................................................................................................. 24

## **TABLE OF AUTHORITIES**

Cases ..................................................................................................................... Page(s)

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) ................................................................... 13

*Bell Supply Co., LLC v. United States*,
    348 F. Supp. 3d 1281 (Ct. Int'l Trade 2018) ............................................ 25

*Bell Supply Co., LLC v. United States*,
    888 F.3d 1222 (Fed. Cir. 2018) ................................................................. 26

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984). ................................................................. 13, 14, 38, 43

*Cleo Inc. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007) ................................................................. 14

*Consolidated Edison Co. v. NLRB*,
    305 U.S. 197 (1938). ................................................................................... 12

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) .................................................................................... 12

*Consumer Prods. Div., SCM Corp. v. Silver Reed Am., Inc.*,
    753 F.2d 1033 (Fed. Cir. 1985) ................................................................. 38

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996) ...................................................... 12, 13, 38

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ...................................... 13, 18

*Lignite Energy Council v. United States EPA*,
    198 F.3d 930 (D.C. Cir. 1999) ................................................................... 16

*Macao Com. & Indus. Spring Mattress Mfr. v. United States*,
    437 F. Supp. 3d 1324 (Ct. Int'l Trade 2020) ............................................ 18

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ................................................................. 12

*Peer Bearing Co.-Changshan v. United States,*
    128 F. Supp. 3d 1286 (Ct. Int'l Trade 2015).................................................. 35, 36

*Pesquera Mares Australes Ltda. v. United States,*
    266 F.3d 1372 (Fed. Cir. 2001)............................................................................ 14

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
    966 F.2d 660 (Fed. Cir. 1992)...................................................................... 14, 39

*Thai Pineapple Pub. Co. v. United States,*
    187 F.3d 1362 (Fed. Cir. 1999)............................................................................ 38

*Timex V.I., Inc. v. United States,*
    157 F.3d 879 (Fed. Cir. 1998)............................................................................ 14

*Timken Co. v. United States,*
    699 F. Supp. 300 (Ct. Int'l Trade 1988)............................................................ 13

*Timken v. United States,*
    354 F.3d 1334 (Fed. Cir. 2004)............................................................................ 14

*U.K. Carbon and Graphite Co., Ltd. v. United States,*
    931 F. Supp. 2d 1322 (Ct. Int'l Trade 2013)...................................... 37, 38, 39, 40

*Usinor v. United States,*
    342 F. Supp. 2d 1267 (2004).............................................................................. 40

Statutes

19 U.S.C. § 1671................................................................................................ 14
19 U.S.C. § 1673................................................................................................ 14
19 U.S.C. § 1677(25).......................................................................................... 14
19 U.S.C. § 1677j....................................................................................... *passim*
19 U.S.C. § 1677j(b)(1)(A)-(E)................................................................... *passim*
19 U.S.C. § 1677j(b)(2)(A)-(E)................................................................... *passim*
19 U.S.C. § 1677j(b)(3)............................................................................... *passim*
42 U.S.C. § 7411(a)(1)........................................................................................ 16

Regulations

19 C.F.R. § 351.225(h)................................................................................. 15, 17

<u>Other Authorities</u>

*Certain Corrosion-Resistant Steel Products from China*,
    81 Fed. Reg. 48,390 (Dep't Commerce July 25, 2016) .............................................. 3

*Certain Corrosion-Resistant Steel Products from China*,
    84 Fed. Reg. 48,387 (Dep't Commerce July 25, 2016) .............................................. 3

*Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Correction to
    Affirmative Final Determinations of Anti-Circumvention Inquiries on the Antidumping Duty
    and Countervailing Duty Orders*, 85 Fed. Reg. 882 (Dep't Commerce Jan. 8, 2020) ............. 22

*Certain Cold-Rolled Steel Flat Products From the Republic of Korea:  Affirmative Final
    Determinations of Circumvention of the Antidumping Duty and Countervailing Duty Orders*,
    84 Fed. Reg. 70,948 (Dep't Commerce Dec. 26, 2019), and accompanying IDM... 8, 22, 30, 38

*Certain Tissue Paper Products from the People's Republic of China: Final Affirmative
    Determination of Circumvention of the Antidumping Duty Order*, 78 Fed. Reg. 40,101
    (Dep't Commerce July 3, 2013), and accompanying IDM ......................................... 24

*Certain Tissue Paper Products from the People's Republic of China*,
    78 Fed. Reg. 14,514 (Dep't Commerce Mar. 6, 2013) ........................................... 30

*China/Vietnam CORE Prelim. Determination*,
    82 Fed. Reg. 58,170 (Dep't Commerce Dec. 11, 2017), and accompanying PDM,
    unchanged in *China/Vietnam CORE Final Determination*, 83 Fed. Reg. 23,895
    (Dep't Commerce May 23, 2018), and accompanying IDM ...................................... 29

*Korea/Vietnam CORE Preliminary Determination*,
    84 Fed. Reg. 32,871 (Dep't Commerce Jul. 10, 2019), and preliminary decision
    memorandum, unchanged in *Korea/Vietnam CORE Final Determination*,
    84 Fed. Reg. 70,948 (Dep't Commerce Jan. 8, 2020)............................................ 8

Omnibus Trade Act of 1987, Report of the Senate Finance Committee,
    S. Rep. No. 100-71 (1987) ................................................................... 16

*Polyethylene Retail Carrier Bags from Taiwan*,
    79 Fed. Reg. 31,302 (Dep't Commerce June 2, 2014), and accompanying PDM,
    *unchanged in Polyethylene Retail Carrier Bags from Taiwan,* 79 Fed. Reg. 61,056
    (Dep't Commerce Oct. 9, 2014)................................................................ 19

*Small Diameter Graphite Electrodes from China*,
    77 Fed. Reg. 33,405 (Dep't Commerce June 6, 2012), *unchanged in Small Diameter
    Graphite Electrodes from China*, 77 Fed. Reg. 47,596 (Dep't Commerce Aug. 9, 2012) . 18, 39

Statement of Admin. Action, Accompanying the Uruguay Round Agreements Act (SAA),
    H. R. Doc. No. 103-316, vol. 1, at 893 (1994).............................................................. 15, 16, 17

*Taiwan/Vietnam CORE Final Determination*,
    84 Fed. Reg. 70,937 (Dep't Commerce Dec. 26, 2019), and accompanying IDM ....... 20, 22, 34

Uruguay Round Agreements Act,
    S. Rep. No. 103-412 (1994) ......................................................................................... 15, 32, 36

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| AL GHURAIR IRON & STEEL LLC,                         ) | |
| )  | |
| *Plaintiff*,                       )  | |
| )  | |
| v.                              )  | |
| )  | Court No. 20-00142 |
| UNITED STATES,                             )  | |
| )  | |
| *Defendant*,                       )  | **PUBLIC VERSION** |
| )  | |
| and                             )  | |
| )  | |
| UNITED STATES STEEL CORPORATION,           )  | |
| NUCOR CORPORATION, and STEEL               )  | |
| DYNAMICS, INC.,                            )  | |
| )  | |
| *Defendant-Intervenors*.              )  | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the Court, defendant, the United States, respectfully responds to the motion for judgment on the agency record filed by plaintiff, Al Ghurair Iron & Steel LLC (AGIS).  Plaintiff challenges several aspects of the United States Department of Commerce's final determination of circumvention of the antidumping and countervailing duty orders on certain corrosion-resistant steel products (CORE) from the People's Republic of China. Plaintiff's motion should be denied because Commerce's final determination of circumvention is supported by substantial evidence and in accordance with law.

**STATEMENT PURSUANT TO RULE 56.2**

I.      The Administrative Determination Under Review

The administrative determination under review is *Certain Corrosion-Resistant Steel Products from China: Affirmative Final Determination of Circumvention Involving the United Arab Emirates*, 85 Fed. Reg. 41,957 (Dep't Commerce July 13, 2020) (final circumvention determination) (*Final Determination*) (AD P.R. 150, CVD P.R. 142),[1] and accompanying Issues and Decision Memorandum (IDM) (AD P.R. 148, CVD P.R. 141).  The period examined in this circumvention inquiry covers July 1, 2015 to July 31, 2019.

II.     Issues Presented For Review

1.      Whether Commerce's determination, pursuant to 19 U.S.C. § 1677j(b)(2)(A), that the level of investment in the process of assembly or completion of CORE in the United Arab Emirates (UAE) is minor, is supported by substantial evidence and not contrary to law.

2.      Whether Commerce's determination, pursuant to 19 U.S.C. §§ 1677j(b)(2)(C) and (b)(2)(D), that the nature of the production process and extent of facilities for completion of CORE in the UAE are minor, is supported by substantial evidence and not contrary to law.

3.      Whether Commerce's determination, pursuant to 19 U.S.C. § 1677j(b)(2)(E), that the value of processing performed in the UAE represents a small proportion of the value of the CORE imported into the United States, is supported by substantial evidence and not contrary to law.

---

[1]  There are four administrative indices for the *Final Determination*.  Citations to the antidumping duty public record (AD P.R.) and the antidumping duty confidential record (AD C.R.) refer to the record of the underlying antidumping duty circumvention inquiry.  Citations to the countervailing duty public record (CVD P.R.) and the countervailing duty confidential record (CVD C.R.) refer to the record of the underlying countervailing duty circumvention inquiry.  We also cited to AGIS's motion for judgment on the agency, ECF No. 34, 36, as "AGIS Br."

4.      Whether Commerce's use of surrogate values from Malaysia to value Chinese-origin hot-rolled steel and cold-rolled steel substrate, used by AGIS to produce finished CORE, is supported by substantial evidence and not contrary to law.

5.      Whether Commerce's determination, pursuant to 19 U.S.C. § 1677j(b)(3)(A), that the pattern of trade, including sourcing patterns, in the UAE supports a finding of circumvention, is supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

I.     <u>Initiation Of Circumvention Inquiry</u>

In July, 2016, Commerce published the China antidumping duty and countervailing duty CORE Orders.  *Certain Corrosion-Resistant Steel Products from China*, 81 Fed. Reg. 48,390 (Dep't Commerce July 25, 2016) (antidumping duty order); *Certain Corrosion-Resistant Steel Products from China*, 84 Fed. Reg. 48,387 (Dep't Commerce July 25, 2016) (countervailing duty order) (collectively, *China CORE Orders*).  In August, 2019, Commerce published a notice self-initiating several circumvention inquiries of the *China CORE Orders*, covering Chinese-origin hot-rolled steel and/or cold-rolled steel substrate input that is exported to various countries for completion into CORE and then exported to the United States.  *Corrosion-Resistant Steel Products from China*, 84 Fed. Reg. 43,585 (Dep't Commerce Aug. 21, 2019) (initiation of circumvention inquiry) (*Initiation Notice*), and accompanying Initiation of Circumvention Inquiries Memorandum (Initiation Mem.) (AD P.R. 5, CVD P.R. 5).

As Commerce has done in prior circumvention inquiries, Commerce initiated the circumvention inquiry involving the UAE on a country-wide basis.  Initiation Mem. at 17-18.  "The information available to Commerce indicates that {evidence of a} shift in trade patterns is likely attributable to country-wide activity in third countries, rather than an individual firm."  *Id.*

3

at 18.

On August 22, 2019, Commerce issued quantity and value questionnaires to four companies identified as either having CORE production capabilities or exporting CORE to the United States.  Quantity and Value Questionnaire, AD P.R. 34, CVD P.R. 34.  Commerce received timely responses from AGIS and United Iron and Steel Company LLC (United Iron).  AGIS reported that it manufactured and exported CORE to the United States containing Chinese-origin hot-rolled steel and/or cold-rolled steel.  AGIS Quantity and Value Response, AD C.R. 6, CVD C.R. 6.  United Iron reported no shipments to the United States of CORE containing Chinese-origin hot-rolled steel and/or cold-rolled steel.  United Iron Quantity and Value Response, AD C.R. 7, CVD C.R. 7.  Based on the quantity and value data that Commerce received, Commerce issued subsequent questionnaires to AGIS and United Iron, to which both companies responded.  *See, e.g.,* AGIS Initial Questionnaire Response (AGIS IQR), AD C.R 8-28, CVD C.R. 8-28; AGIS Supplemental Questionnaire Response (AGIS SQR), AD C.R. 39-40, CVD C.R. 39-40; AGIS Second Suppl. Questionnaire Resp. (AGIS SSQR), AD C.R. 45, CVD C.R. 45.

II.    Commerce's Preliminary Determination

In February, 2020, Commerce published its preliminary affirmative determination of circumvention.  *Certain Corrosion-Resistant Steel Products from China*, 85 Fed. Reg. 8,841 (Dep't Commerce Feb. 18, 2020) (preliminary circumvention determination) (*Preliminary Determination*) (AD P.R. 153, CVD P.R. 114), and accompanying Preliminary Decision Memorandum (PDM) (AD P.R. 121, CVD P.R. 113).  The period of inquiry was July 1, 2015 through July 31, 2019.  PDM at 7-8.  This period coincides with the initiation of the underlying antidumping and countervailing duty investigations of CORE from China and the self-initiation

of this circumvention inquiry (on June 30, 2015, and August 12, 2019, respectively). *Id.*

Commerce preliminarily determined that CORE completed in the UAE, using hot-rolled steel and cold-rolled steel substrate manufactured in China, and exported to the United States, is circumventing the *China CORE Orders*.  PDM at 1, 12, 25.  This determination was based on Commerce's application of statutory criteria.  *See* 19 U.S.C. § 1677j(b)(1).  Weighing the first two of five criteria, Commerce preliminarily concluded that the CORE at issue is the same class or kind as merchandise that is subject to the *China CORE Orders*, and was completed or assembled in a foreign country (the UAE) using Chinese-origin hot-rolled and/or cold-rolled steel.  PDM at 12-13, 25; *see* 19 U.S.C. § 1677j(b)(1)(A)-(B).

Considering the third criteria, Commerce preliminarily determined that the process of assembly or completion of CORE in the UAE is minor or insignificant.  PDM at 13-22; *see* 19 U.S.C. § 1677j(b)(1)(C).  This analysis involved consideration of five additional statutory sub-factors.  *See id.* § 1677j(b)(2)(A)-(E).  Specifically, Commerce found that the level of investment in the UAE is minor in terms of both initial capital and equipment.  PDM at 14-16.  The level of research and development in the UAE also is insignificant.  *Id.* at 16-18.  The nature of the production process in the UAE, and the extent of the production facilities in the UAE, are likewise insignificant.  *Id.* at 18-20.  Finally, the value of processing performed in the UAE represents a "small proportion of the value of the merchandise imported into the United States." *Id.* at 20-22.

Considering the fourth criteria, Commerce further preliminarily determined that the value of the Chinese-origin hot-rolled steel and/or cold-rolled steel substrate used by AGIS to produce CORE in the UAE represents a significant portion of the total value of the merchandise exported to the United States.  PDM at 8-9, 22-23; 19 U.S.C. § 1677j(b)(1)(D).  To reach this conclusion,

Commerce relied on surrogate value data from Malaysia to value the Chinese-origin hot-rolled steel and/or cold-rolled steel substrate. *Id.* This approach is consistent with Commerce's practice in prior circumvention inquiries. *Id.*

Commerce then turned to consideration of additional factors in the circumvention statute. *Id.* at 23-25; *see* 19 U.S.C. § 1677j(b)(3). Of note, Commerce preliminarily determined that both the pattern of trade in the UAE, including sourcing patterns, and evidence of increased imports of substrate input from China into the UAE, supported a finding of circumvention of the *China CORE Orders*. PDM at 23-25. However, the record did not suggest that producers or exports of CORE in China are affiliated with producers and exporters of CORE in China. *Id.*

Finally, based on its analyses and conclusions under these factors, Commerce preliminarily determined that action is appropriate to prevent evasion of the *China CORE Orders* pursuant to 19 U.S.C. § 1677j(b)(1)(E). PDM at 25. To that end, Commerce preliminarily determined that AGIS will be required to participate in the certification process. PDM at 26-28.

III.    Commerce's Final Determination

In July 2020, Commerce published its *Final Determination*. *See Certain Corrosion-Resistant Steel Products from China*, 85 Fed. Reg. 41,957, and accompanying IDM. Commerce continued to find, pursuant to 19 U.S.C. § 1677j(b), that CORE completed in the UAE from Chinese-origin hot-rolled and cold-rolled steel substrate are circumventing the *China CORE Orders* and should be considered within the scope of those orders. IDM at 1, 9, 25. In support, Commerce reiterated the statutory framework and continued its conclusions from the *Preliminary Results* with respect to the five statutory criteria, 19 U.S.C. §§ 1677j(b)(1)(A)-(E) and (b)(2), and other factors for consideration, *id.* § 1677j(b)(3)(A). As germane to this appeal, Commerce made changes only to the surrogate value added calculation. IDM at 5.

In response to objections from AGIS, Commerce elaborated on its rationale with respect to the level of investment factor under 19 U.S.C. § 1677j(b)(2)(A).  *Id.* at 7, 15-18.  The level of investment for completing CORE in the UAE, by AGIS and all other UAE respondents, is minor relative to the level of investment required of producers of hot-rolled or cold-rolled inputs in China.  IDM at 17 (citing PDM at 14-16).  Evidence from the Organization for Economic Cooperation and Development (OECD) reflects that the average expenditure for construction of integrated steel mills in China ($3.6 billion) is roughly 15 times greater than the investment required to build facilities to finish the CORE production process in the UAE.  *Id.* (citing Initiation Mem. at Ex. 6 (OECD Report) at 29-32, and Ex. 7(f) (Middle East Business Intelligence, *United Iron & Steel Starts Abu Dhabi Plant Construction*, April 12, 2015 (MidEast Business Intel.), AD P.R. 8, CVD P.R. 8); *see also* Prelim. Analysis Mem. at 2 (Dep't Commerce Feb. 7, 2020) (AD C.R. 47, CVD C.R. 47) (AGIS-specific analysis).  Although AGIS contended that this difference may be attributed to differences in production capacity, Commerce determined that AGIS's argument is not supported in the record and, even if true, any magnitudes of difference would only further show how little investment is necessary to complete production in the UAE.  IDM at 17-18.

Differences in investment are attributable to differences in the nature of the production process and the extent of production facilities.  *Id.* at 18.  For example, the number and nature of production steps to produce steel substrate are "more numerous, more technologically complex, and require substantially more investment"—*i.e.*, steel making, slab casting, and hot-rolling— than the CORE production stages undertaken by a UAE company, *i.e.*, galvanizing and cold-rolling."  *Id.*

Commerce likewise elaborated on its continued conclusion that the level of research and development in the UAE is minor, under 19 U.S.C. § 1677j(b)(2)(B).  IDM at 18.  AGIS admitted that it had not established research and development facilities in the UAE.  *Id.*  Based on available evidence, moreover, it appears that research and development of CORE production in the UAE is similar to the research and development of CORE in Vietnam, which Commerce has previously found insignificant, not only standing alone but also in comparison to the research and development conducted by a Taiwanese hot-rolled steel mill.  *Id.* (citing *Korea/Vietnam CORE Preliminary Determination*, 84 Fed. Reg. 32,871 (Dep't Commerce Jul. 10, 2019), and preliminary decision memorandum at 13-14, unchanged in *Korea/Vietnam CORE Final Determination*, 84 Fed. Reg. 70,948 (Dep't Commerce Jan. 8, 2020)).

Additionally, Commerce continued to find that the nature of the production process and the extent of the production facilities in the UAE is minor, pursuant to 19 U.S.C. § 1677j(b)(2)(C) and (b)(2)(D).  IDM at 18-19.  In support, Commerce incorporated by reference its discussion of the relative nature of the production processes, addressed under the prior factor concerning level of investment.  *See id.* at 19.  Commerce further found that the CORE production process is similar from country to country, and in other circumvention inquiries, Commerce had found the nature of that production process to be minor relative to production of the substrate input.  *Id.* at 18-19 (citing Initiation Mem. at Ex. 3 (*Certain Corrosion-Resistant Steel Products from China, Italy, India, Korea and Taiwan*, Inv. Nos. 701-TA-534-537 and 731-TA-1274-1278, ITC Pub. No. 4620 (2016) (ITC CORE Report), AD P.R. 8, CVD P.R. 8).

In response to AGIS's argument that its circumstances are distinguishable because it uses relatively skilled labor, Commerce determined that AGIS has not offered factual support for this assertion and, in any event, Commerce was already factoring labor in the value analysis; that

analysis reflected that labor to produce CORE in the UAE is insignificant.  IDM at 19.

Commerce further rejected AGIS's reliance on a single past decision in which Commerce had

found that galvanizing steel constitutes a substantial transformation of the product.  *Id.* at 20.

Commerce explained that this decision is inapposite because the analyses for substantial

transformation and circumvention are distinct.  *Id.*; PDM at 10.

Regarding Commerce's inquiry into value added, pursuant to 19 U.S.C. § 1677j(b)(2)(E),

Commerce's analysis did not change from the *Preliminary Results*.  IDM at 8.  Commerce had

considered information submitted by AGIS, information from the ITC CORE Report,

information sourced from MEPS International's World Carbon Steel Price Database (MEPS),

and prior circumvention determinations.  *Id.*; PDM at 20-22.  However, Commerce did make

some modifications to its calculation of a value-added percentage formula.  IDM at 20 (citing

Final Analysis Mem., AD C.R. 88, CVD C.R. 87).  This modification was in response to AGIS's

argument that Commerce should take into account certain additional expenses—specifically,

profit, financial expenses, and selling, general and administrative (SG&A) expenses.  *Id.*  As

Commerce further explained, however, including such expenses in the calculation "does not

materially change" the percentage of value added, "and thus the cost of processing {cold-rolled

steel and hot-rolled steel} would still be much greater than the cost of processing CORE in the

UAE."  *Id.*

Commerce also continued to use surrogate values from Malaysia to value the Chinese-

origin hot-rolled steel and cold-rolled steel substrate.  *Id.* at 20-21.  As Commerce explained,

"although actual prices paid for China-produced inputs are typically used in the cost buildup in

{market economy} proceedings," this inquiry arose as part of an "anti-circumvention

proceeding{} initiated under the *China CORE Orders*, which are {non-market economy}

proceedings." *Id.* Specifically, Commerce must analyze "respondent's Chinese-origin input costs, which fall under the purview of Commerce's non-market economy methodology . . . ." *Id.*

AGIS argued that Commerce should have assessed the cost of the Chinese-sourced input based on a market economy country because UAE is a market economy country. AGIS Br. at 31-34. But AGIS failed to cite any legal support for its position. *Id.* Moreover, Commerce has used the surrogate value methodology in prior circumvention analyses involving non-market economy countries. *Id.* Thus, consistent with its practice, Commerce determined to use a surrogate value methodology to value Chinese-origin hot-rolled steel and cold-rolled steel in this review. *Id.* Based on application of this methodology, the agency continued to find that the value of the Chinese-origin steel substrate used by AGIS to produce CORE in the UAE is a significant portion of the total value of the merchandise imported into the United States, under 19 U.S.C. § 1677j(b)(1)(D). *Id.*

Finally, as germane to this appeal, Commerce continued to determine that the pattern of trade, including sourcing patterns, supported a finding of circumvention under 19 U.S.C. § 1677j(b)(3)(A). IDM at 11-15. Commerce had determined to conduct the circumvention inquiry on a country-wide basis and not a company-specific basis; thus, Commerce did consider, and it was appropriate to consider, country-wide data in evaluating this factor. *Id.* at 11. Consistent with practice, Commerce explained that it also purposefully compared pattern of trade data using base and comparison periods—here, the 49-month period before and after the month of initiation of the original antidumping and countervailing duty investigations of CORE from China. *Id.* at 12. This sort of comparison allowed Commerce to consider trade patterns prior to and after the discipline of having to pay antidumping or countervailing duties. *See id.*

Comparing data from the 49-month period before and after initiation, the average

monthly volume of imports of steel substrate from China into the UAE rose by 47.01 percent and

35.01 percent, respectively, while United States imports of CORE from the UAE rose over 5,000

percent. *Id.*; PDM at 23-24. Record evidence also reflected that AGIS has increased its sourcing

of Chinese-manufactured substrate input for use in AGIS's production of CORE in the UAE

subsequently exported to the United States. IDM at 12 (citing Prelim. Analysis Mem. at 8).

Commerce was not persuaded by any of AGIS's other objections to Commerce's pattern of trade

analysis. *See id.* at 12-15.

    After Commerce published its affirmative finding of circumvention in the *Final

Determination*, this litigation followed.

## SUMMARY OF THE ARGUMENT

    Commerce's determination that CORE completed or assembled in the UAE from Chinese

hot-rolled or cold-rolled steel substrate is circumventing the *China CORE Orders* is supported by

substantial evidence and not contrary to law. AGIS does not challenge Commerce's conclusions

rendered under most of the statutory factors. *See* 19 U.S.C. § 1677j(b)(1)(A), (B), (E). Nor does

AGIS challenge Commerce's conclusions rendered under two of the three additional factors

identified within subparagraph (b)(3).

    Commerce's analyses under each the remaining factors, challenged by AGIS, are

supported by substantial evidence and not contrary to law. *See* 19 U.S.C. § 1677j(b)(1)(C), (D);

*id.* § 1677j(b)(2)(A), (C)-(E). First, Commerce reasonably determined that the level of

investment to complete CORE in the UAE is minor when compared to the level of investment

required of producers of the hot-rolled steel and/or cold-rolled steel substrate in China. Second,

Commerce reasonably determined that the nature of production process and the extent of

facilities to complete CORE in the UAE are also minor. Third, Commerce reasonably

determined that the processing performed to complete the CORE in the UAE reflects a small proportion of the value of the CORE imported into the United States, based on both qualitative and quantitative analyses. Fourth, Commerce's use of a surrogate value methodology to value the hot-rolled steel and cold-rolled steel inputs used by AGIS to complete the production of CORE reflects a reasonable construction of Commerce's statutory obligations, and in fact, this Court has deferred to Commerce's methodology in the past. Finally, Commerce reasonably determined that the pattern of trade, including sourcing patterns, supports a finding of country-wide circumvention.

For these reasons, Commerce's final determination of circumvention should be sustained.

## **ARGUMENT**

I.     <u>Standard Of Review</u>

This Court sustains "'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1037 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "Substantial evidence" consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Therefore, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted). The Court should sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole,

even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984) (citation omitted).

"{T}he antidumping statute reveals tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law." *Fujitsu*, 88 F.3d at 1039 (internal quotation and citation omitted).  "Antidumping and countervailing duty determinations involve complex accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." *Id.* (citation omitted).  "This deference is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute, as opposed to interpreting the meaning of the statute itself where ambiguous." *Id.*

The Court would not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007).  Accordingly, the Court should "not substitute its judgment for that of {Commerce} when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.'" *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006); *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (explaining "{i}t is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency").

If an agency's construction of a statute is at issue, the Court is guided by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *Chevron* dictates that the Court "must first carefully investigate the matter to determine whether Congress's

purpose and intent on the question at issue is judicially ascertainable." *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1998) (citing *Chevron*, 467 U.S. at 842-43 & n.9).   If the statute is silent or ambiguous with respect to an issue, the Court determines whether Commerce's interpretation is based upon a reasonable construction of the statute.   *Chevron*, 467 U.S. at 843. "{S}tatutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under *Chevron*."   *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001); *Timken v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004).   It is not the Court's duty to weigh the wisdom of Commerce's legitimate policy choices. *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 966 F.2d 660, 665 (Fed. Cir. 1992).

II.    Legal Framework

The Tariff Act of 1930, as amended, allows Commerce to impose antidumping and countervailing duties on merchandise from foreign countries.   19 U.S.C. §§ 1671, 1673.   In conducting antidumping and countervailing duty proceedings, Commerce examines subject merchandise, which means "the class or kind of merchandise that is within the scope" of an investigation, a review, or an order.   *Id.* § 1677(25).

The statute also contains provisions aimed at preventing an entity's circumvention of Commerce's antidumping or countervailing duty orders.   *See id.* § 1677j.   Among the different types of circumvention recognized by the statute, Commerce may find unlawful circumvention when merchandise, of the same class or kind as that subject to an antidumping or countervailing duty order, is completed or assembled in a foreign country other than the country to which the order applies.   *Id.* § 1677j(b).

This type of circumvention is based on five statutory criteria:

> (A) {the} merchandise imported into the United States is of the
> same class or kind as any merchandise produced in a foreign
> country that is the subject of . . . {an AD/CVD order},

(B) before importation into the United States, such imported
merchandise is completed or assembled in another foreign
country from merchandise which . . . is subject to the order . . .,
or . . . produced in a foreign country . . . to which such order
. . . applies,

(C) the process of assembly or completion in the foreign country
. . . is minor or insignificant,

(D) the value of the merchandise produced in the foreign country
. . . is a significant portion of the total value of the merchandise
exported to the United States, and

(E) action is appropriate . . . to prevent evasion of such order . . . .

*Id.* § 1677j(b)(1); *see also* 19 C.F.R. § 351.225(h) (explaining that Commerce "may include

within the scope of an antidumping or countervailing duty order, at any time such order is in

effect, imported merchandise completed or assembled in a foreign country other than the country

to which the order applies").

Whether the process of assembly or completion under section 1677j(b)(1)(C) is "minor or

insignificant" also depends on five sub-factors:

(A) the level of investment in the foreign country;

(B) the level of research and development in the foreign country;

(C) the nature of the production process in the foreign country;

(D) the extent of the production facilities in the foreign country;

(E) whether the value of the processing performed in the foreign
country represents a small proportion of the value of the
merchandise imported into the United States.

*Id.* § 1677j(b)(2).  No one single sub-factor is controlling.  19 C.F.R. § 351.225(h); Statement of

Admin. Action, Accompanying the Uruguay Round Agreements Act (SAA), H. R. Doc.

No. 103-316, vol. 1, at 893 (1994).  Commerce will evaluate each of the sub-factors depending

on the totality of the circumstances in the record before it.  *See* SAA at 893.  Moreover, when—as in this case—Congress has prescribed the factors but not their relative weight, the agency should be afforded a "great degree of discretion in balancing" the factors.  *See Lignite Energy Council v. United States EPA*, 198 F.3d 930, 932-33 (D.C. Cir. 1999) (holding that, because 42 U.S.C. § 7411(a)(1) required the Environmental Protection Agency to "take into account" certain factors, but "d{id} not set forth the weight that should be assigned to each of these factors," the Court "granted the agency a great degree of discretion in balancing them" (internal citations omitted)).

The statute further addresses whether merchandise assembled or completed in a foreign country should be included within the scope of an antidumping or countervailing duty order; this inquiry depends on three sub-factors:

> (A) the pattern of trade, including sourcing patterns,
>
> (B) whether the manufacturer or exporter of the merchandise . . . described in {§ 1677j(b)(1)(B)} is affiliated with the person who uses the merchandise described in {§ 1677j(b)(1)(B)} to assemble or to complete in the foreign country the merchandise that is subsequently imported into the United States; and
>
> (C) whether imports into the foreign country of the merchandise described in {§ 1677(b)(1)(B)} have increased after the initiation of the investigation that resulted in the issuance of such order . . . .

*Id.* § 1677j(b)(3).

The legislative history of these circumvention provisions indicates that their purpose is to "authorize the Commerce Department to apply antidumping and countervailing duty orders in such a way as to prevent circumvention and diversion of U.S. law."  Omnibus Trade Act of 1987, Report of the Senate Finance Committee, S. Rep. No. 100-71, at 101 (1987).  Congress has expressed its intention that the circumvention statute "grant the Commerce Department

substantial discretion in interpreting these terms, and invoking these measures, so as to allow it flexibility to apply the provisions in an appropriate matter" and that Commerce use its authority "to the fullest extent possible to combat diversion and circumvention of the antidumping and countervailing duty laws."  *Id.* at 100.  "{A}ggressive implementation" of the circumvention laws "can foreclose these practices."  *Id.*

III.   **Commerce's Conclusion That AGIS's Assembly Or Completion Of CORE In The UAE Is Minor Or Insignificant Is Supported By Substantial Evidence And Not Contrary To Law**

Commerce's circumvention determination is supported by Commerce's reasonable conclusion that AGIS's assembly or completion of CORE in the UAE is minor or insignificant. *See* 19 U.S.C. § 1677j(b)(1)(C).  As described above, to determine whether the process of assembly or completion in a third country is minor or insignificant, Commerce evaluates:  (1) the level of investment in the foreign country; (2) the level of research and development in the foreign country; (3) the nature of the production process in the foreign country; (4) the extent of the production facilities in the foreign country; and (5) whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States.  19 U.S.C. § 1677j(b)(2).  No single factor is controlling and Commerce's practice is to evaluate the factors on a case-specific basis.  *See* 19 C.F.R. § 351.225(h); SAA at 893.

Applying these factors, Commerce reasonably concluded that AGIS's assembly or completion of CORE in the UAE is minor or insignificant.  *See* IDM at 7-8; PDM at 13-22.  For example, Commerce found that available information, including information provided by AGIS, indicates that the level of research and development in the UAE is insignificant under 19 U.S.C. § 1677j(b)(2)(B).  IDM at 7; PDM at 16-18.  AGIS does not contest Commerce's finding with regard to this factor, which is supported by substantial evidence and not contrary to law.

Commerce's evaluation of the other four factors—subsections (A), (C), (D), and (E) under 19 U.S.C. §§ 1677j(b)(2)—now challenged by AGIS, are also supported by substantial evidence and not contrary to law.  As an initial matter, AGIS has not shown that the record information is "supported one, and only one, reasonable conclusion" consistent with AGIS's view of the facts and contrary to Commerce's determination.  *See Macao Com. & Indus. Spring Mattress Mfr. v. United States*, 437 F. Supp. 3d 1324, 1335 (Ct. Int'l Trade 2020).  Rather, AGIS essentially asks the Court to reweigh the evidence in AGIS's favor.  This the Court obviously should not do within well-established standards of review.  *See Goldlink*, 431 F. Supp. 2d at 1326; *Usinor v. United States*, 342 F. Supp. 2d 1267, 1272 (2004) (holding that the Court may not "reweigh the evidence or substitute its own judgment for that of the agency{.}").

A.    The Level Of Investment In The UAE Is Minor

Commerce's conclusion that the level of investment in the UAE is minor when compared to the level of investment required by producers of Chinese-origin hot-rolled steel and/or cold-rolled steel inputs is supported by substantial evidence and not contrary to law.  *See* IDM at 7, 13-20; PDM at 14-16; *see* 19 U.S.C. § 1677j(b)(2).

The statute does not direct Commerce to evaluate the level of investment factor in any one particular way; thus, Commerce has discretion in its analysis of this factor.  Commerce generally analyzes investment levels by comparing the total investment required from the beginning of the production process in the country subject to an order (here, China), to the total investment required to perform the finishing steps in the third country (here, the UAE).  IDM at 7, 17-18; PDM at 16.  For example, in *Small Diameter Graphite Electrodes from China*, Commerce compared the level of investment required for a Chinese manufacturer to produce an unfinished graphitized electrode to the level of investment needed by the third country producer to perform its finishing processes.  *See Small Diameter Graphite Electrodes from China*, 77 Fed.

Reg. 33,405, 33,412-13 (Dep't Commerce June 6, 2012) (preliminary circumvention

determination), *unchanged in Small Diameter Graphite Electrodes from China*, 77 Fed. Reg.

47,596 (Dep't Commerce Aug. 9, 2012).  Similarly, in *Polyethylene Retail Carrier Bags from*

*Taiwan*, Commerce compared the level of investment required of Taiwanese producer to produce

polyethylene film tubes with the level of investment for a domestic producer in the United States

to convert the polyethylene film tubes into finished subject merchandise.  *See Polyethylene*

*Retail Carrier Bags from Taiwan*, 79 Fed. Reg. 31,302 (Dep't Commerce June 2, 2014)

(preliminary circumvention determination), and accompanying PDM at 9-10, *unchanged in*

*Polyethylene Retail Carrier Bags from Taiwan,* 79 Fed. Reg. 61,056 (Dep't Commerce Oct. 9,

2014).

By making such a comparison, Commerce has determined that it is best able discern what

portion of the total value of the merchandise is accounted for in the last step of processing.  PDM

at 15-16.  That fact, in turn, is "relevant to whether a producer would reasonably move its further

processing across borders to avoid the discipline of the order."  *Id.* at 16.  The comparison itself

is thus a reasonable approach taken by Commerce in the circumvention context.  *Id.*

Consistent with its practice, Commerce compared the level of investment for the final

stages of the CORE production process in the UAE to the level of investment of the producers of

hot-rolled and cold-rolled inputs in China.  IDM 17-18, PDM at 14-16.  To understand the

significance of this comparison, it is important to start with an understanding of the entirety of

the production process for CORE.  IDM at 18.  The production process for CORE begins with

the production of steel through either the electric arc furnace method or the blast furnace/basic

oxygen furnace method.  PDM at 14; *see* ITC CORE Report at I-18-21.  Once the steel is in a

molten state, it is cast into a semi-finished product called a slab, which is then reheated and

rolled to produce hot-rolled steel in coil form.  The hot-rolled steel coil undergoes additional

processing in the final stages and may be cold rolled into cold-rolled steel.  The hot-rolled steel

and/or cold-rolled steel coils may then be galvanized (*i.e.*, coated or plated) with corrosion- or

heat-resistant metal to prevent corrosion and extend the service life of products produced from

the steel.  PDM at 13-14.

 Taking into account the entirety of the production process, Commerce found that the

level of investment in the UAE when completing the final stages in the production of CORE

(*e.g.*, cold-rolling and galvanizing) is minor.  IDM at 17; PDM at 16.  In reaching this

determination, Commerce considered information from a 2015 OECD report on the steel

industry, which indicates that the average expenditure for construction of integrated steel mills in

China was $3.6 billion, with projects ranging from $295 million to $10.12 billion.  IDM at 17

(citing MidEast Business Intel.); PDM at 15 (citing OECD Report at 29-32). Commerce also

considered its prior circumvention finding in the *China/Vietnam CORE Final Determination*, in

which it similarly relied on the 2015 OECD report in making an affirmative determination of

circumvention.  IDM at 17; PDM at 15; *Certain Corrosion-Resistant Steel Products from China:*

*Affirmative Final Determination of Circumvention*, 83 Fed. Reg. 23,895 (Dep't Commerce May

23, 2018) (final circumvention determination) (*China/Vietnam CORE Final Determination)*, and

accompanying IDM at 39.

 By contrast, the record reflects that existing facilities with both cold-rolling mills and

galvanizing lines in the UAE were constructed with initial investments at much lower levels than

an average of $3.6 billion.  For example, the initial investment cost of United Iron's facility for

the completion of CORE was $272 million (2015), which is 15 times less than the average

expenditure for construction of an integrated steel mill in China.  *See* IDM at 17 (citing MidEast

Business Intel.); PDM at 15 (citing Initiation Mem. at Ex. 7A-C, AD P.R. 8, CVD P.R. 8).

Additionally, Commerce specifically considered the investment information submitted by AGIS, even though AGIS contends the agency did not.  As noted in Commerce's decision memoranda, "the precise amounts of AGIS's capital investment is proprietary information; thus, further discussion is detailed in the AGIS Preliminary Analysis Memorandum."  PDM at 15 (citing Prelim. Analysis Mem); *accord* IDM at 17.  In turn, the Preliminary Analysis Memorandum explains that AGIS reported an initial monetary investment of approximately [█████████████████████████], a shareholder loan of [████████████], a project term loan of [████████████], an additional investment from its owners of [████ ████████], and an additional shareholder loan in 2016 of [████████████] for setting up a second galvanizing line.  Prelim Analysis Mem. at 2.  By the end of 2018, AGIS's total assets were valued at [████████████████████████████████████████].  *Id.*

In analyzing this information, Commerce reasonably determined that the level of investment in the UAE of $272 million, or of [████████████████████████], "is minor when compared to the level of investment {($3.6 billion)} required to produce the {hot-rolled steel and/or cold-rolled steel} inputs in China."  IDM at 17.

AGIS counters that its facilities represent a significant investment of capital unlike anything Commerce previously considered to support a finding of circumvention.  *See* AGIS Br. 20-22 (arguing its investment in CORE is "huge"); *cf.* Prelim. Analysis Mem. at 2.  However, a particular company's investment is relevant in the analysis only insofar as that investment is compared to the entirety of the production process for CORE.  As discussed above, the level of investment in the UAE (whether by UAE producers generally, or AGIS in particular) is much lower than the average investment required to produce the hot-rolled steel and/or cold-rolled

steel substrate in China.

AGIS's argument also ignores numerous circumvention inquiries involving the *China CORE Orders*, as well as orders covering CORE from other countries, in which Commerce found circumvention when producers in third countries were similarly processing hot-rolled steel and/or cold-rolled steel into CORE. *See China/Vietnam CORE Final Determination*, 83 Fed. Reg. 23,895 (Dep't Commerce May 23, 2018), and accompanying IDM at 34-39 (finding that the level of investment of integrated Chinese steel producers of hot-rolled steel and/or cold-rolled steel is much higher than the respondents' level of investment to finish the CORE production process); *Certain Corrosion-Resistant Steel Products from Taiwan*, 84 Fed. Reg. 70,937 (Dep't Commerce Dec. 26, 2019) (final circumvention determination) (*Taiwan/Vietnam CORE Final Determination)*, and accompanying IDM at 8, 60-62 (finding that the level of investment undertaken by the respondents completing CORE in Vietnam was minor when compared to the level of investment by integrated steel mills in Taiwan); *Certain Corrosion-Resistant Steel Products From the Republic of Korea*, 84 Fed. Reg. 70,948 (Dep't Commerce Dec. 26, 2019) (final circumvention determination) (*Korea/Vietnam CORE Final Determination)*,[2] and accompanying IDM at 11-12 (finding that the level of investment for completing CORE in Vietnam is minor, taking into account record information in combination with the application of facts available, with an adverse inference). While Commerce's determinations in one circumvention inquiry are not binding on another, Commerce may nevertheless find those conclusions persuasive if, as in this case, it has a reasoned basis for doing so. Namely, evidence

---

[2] Commerce issued a subsequent notice to correct certain information unrelated to level of investment. *See Certain Corrosion-Resistant Steel Products from the Republic of Korea: Correction to Affirmative Final Determinations of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 85 Fed. Reg. 882 (Dep't Commerce Jan. 8, 2020).

suggests that the investment level and production process for completion of CORE does not vary significantly from country to country. These prior determinations therefore provide further support that a company completing the final steps of CORE production (*i.e.,* finishing hot-rolled steel and/or cold-rolled steel into CORE) require a much lower level of investment than the integrated steel producers of hot-rolled steel and/or cold-rolled steel.

AGIS further counters that a level of investment in the UAE of $272 million is close to the low end of $295 million discussed in the OECD report. AGIS Br. at 26. As Commerce stated, the OECD report indicates that the average investment for construction of integrated steel mills in China was $3.6 billion, with projects ranging from $295 million to $10.12 billion. IDM at 17. The level of investment of $272 million in the UAE is still lower. In any event, Commerce reasonably concluded that substantial evidence still supports a finding that the level of investment in the UAE is minor when compared to the average level of investment of integrated steel mills in China.

AGIS further argues that Commerce failed to credit AGIS's contention that its operations were undertaken long before Commerce's investigations into CORE from China and there is no evidence to suggest that AGIS's operations or investment was in response to the *China CORE Orders*. AGIS Br. at 14, 23. AGIS essentially argues that Commerce has not shown that AGIS intended to circumvent the China CORE Orders. But intent is not required. As Commerce explained, the statute does not require Commerce find an intent to evade as a prerequisite to a finding circumvention. IDM at 13-14 (citing 19 U.S.C. § 1677j). Commerce need only determine, in relevant part, that action on the agency's part is appropriate to prevent evasion. IDM at 13 (quoting 19 U.S.C. § 1677j(b)(1)(E)). *Id.*

A circumvention determination is, likewise, not conditioned on Commerce finding that a company's operations were formed after the issuance of an antidumping or countervailing duty order.  IDM at 13-14 (discussing 19 U.S.C. § 1677j(b)).  Nor has AGIS cited anything in the congressional record to support AGIS's notion that Congress intended to limit the scope of circumvention inquiries in this manner.  IDM at 14.  As Commerce explained, "{w}hile AGIS and other CORE facilities in the UAE may have been constructed prior to the *China CORE Orders*, its facilities provided the opportunity for Chinese steel substrate to be made into CORE in the UAE and then shipped to the United States."  *Id*.  AGIS's does not meaningfully address this logical, reasoned conclusion.

Commerce further observed that its rejection of these arguments is consistent with its determinations in other reviews.  IDM at 14 (citing *Certain Cold-Rolled Steel Flat Products From the Republic of Korea:  Affirmative Final Determinations of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 84 Fed. Reg. 70,934 (Dep't Commerce Dec. 26, 2019), and accompanying IDM at 59-60); *see also Certain Tissue Paper Products from the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty Order*, 78 Fed. Reg. 40,101 (Dep't Commerce July 3, 2013), and accompanying IDM.

AGIS also argues that Commerce should not compare AGIS's investments to the investments in integrated steel mills in China.  AGIS Br. at 23.  However, as discussed above, Commerce's practice is to compare the total investment required from the beginning of the production process in the country subject to an order, to the total level of investment required to perform the finishing steps in the third country.  IDM at 17-18; PDM at 16.  Commerce followed its practice and compared the level of investments of fully integrated steel producers in China

that produce the inputs (*i.e.,* hot-rolled steel and/or cold-rolled steel) being completed into CORE in the UAE to that required for the final stages of the CORE production process.  This practice is reasonable because it allows Commerce to compare the investment during the assembly and completion stages with the overall manufacture of merchandise, which in turn allows Commerce to analyze what portion of the total value of the merchandise subject to a circumvention inquiry is accounted for during the last stage of the production process.  PDM at 15-16.

Finally, AGIS argues that it is not appropriate to compare AGIS's investments in CORE to the investments of integrated steel mills in China for the additional reason that there is no evidence that any of these Chinese integrated steel mills produced CORE.  AGIS Br. at 23-24.  AGIS argues that Commerce should have instead compared the level of investment required to produce CORE from steel substrate in the UAE to the level of investment required to completely manufacture the steel input and complete it to CORE in the UAE.  *Id.*

In so arguing, AGIS misplaces reliance on this Court's decision in *Bell Supply Co., LLC v. United States*, 348 F. Supp. 3d 1281, 1296 (Ct. Int'l Trade 2018).  This Court's *Bell Supply* decision concerned Commerce's evaluation of level of investment in the context of a substantial transformation analysis in order to determine country of origin in a scope inquiry.  That case did not involve a circumvention inquiry or any analysis of level of investment under 19 U.S.C. § 1677j(b)(2)(A), as required in this case.  Commerce has explained that its practice for determining substantial transformation in country-of-origin determinations is distinct from Commerce's analysis, under 19 U.S.C. § 1677j(b)(2)(A), in determining whether merchandise is being completed or assembled in a third country in a manner avoiding discipline of an order.  IDM at 20.  "Because the analyses are distinct, a finding that the process of finishing {hot-rolled steel} or {cold-rolled steel} into CORE constitutes a substantial transformation does not preclude

a finding that the process is minor or insignificant in {a circumvention} analysis . . . ." *Id.*

Moreover, the United States Court of Appeals for the Federal Circuit has recognized that "{a}lthough the substantial transformation and circumvention inquiries are similar, they are not identical." *Bell Supply Company, LLC v. United States*, 888 F.3d 1222, 1230 (Fed. Cir. 2018). "The substantial transformation test asks whether, as a result of manufacturing or processing, the product loses its identity and is transformed into a new product having a new name, character and use.  However, even if a product assumes a new identity, the process of assembly or completion may still be minor or insignificant, and undertaken for the purpose of evading an {antidumping or countervailing duty} order." *Id.* (internal quotations and citations omitted). Thus, as confirmed by the Federal Circuit, "even where an article is substantially transformed, Commerce can still find that it is subject to an {antidumping or countervailing duty} order after conducting a circumvention inquiry." *Id.* at 1231.  This Court's subsequent discussion in *Bell Supply*, 348 F. Supp. 3d 1281, is inapposite.

Even if this Court's *Bell Supply* decision were instructive, it did not involve Commerce conducting an analysis pursuant to the AGIS's so-called "ideal" analytical approach because the record did not allow such an analysis in that case.  Commerce compared the investment in processing the merchandise in Indonesia (the third country) with the investment made by a company in the United States.  *Bell Supply*, 348 F. Supp. 3d at 1295.  The Court sustained Commerce's analysis, finding that the "approach is reasonable, so as to not evaluate the level of investment in a vacuum."  *Id.* at 1296.  This Court's *Bell Supply* decision does not undermine Commerce's evaluation of the level of investment factor under 19 U.S.C. § 1677j(b)(2)(A). Commerce's conclusion that investment levels of CORE production in the UAE is minor is supported by substantial evidence and is not contrary to law.

B.    The Nature Of The Production Process And The Extent Of Facilities In
The UAE Are Minor

Commerce reasonably determined, pursuant to 19 U.S.C. §§ 1677j(b)(2)(C) and

(b)(2)(D), that the (i) nature of the production process and (ii) extent of facilities in the UAE are

minor.  IDM at 8, 18-19; PDM at 18-20.  AGIS's challenge to Commerce's analysis under these

statutory prongs is not persuasive.  *See* AGIS Br. at 2, 15-16, 24.

Commerce conducted this circumvention inquiry on a country-wide basis and therefore

Commerce appropriately considered all information on the record, including evidence reflective

of AGIS as well as other UAE producers, the ITC CORE Report, and Commerce's

determinations in other reviews of CORE producers.  *See* IDM at 18-19; PDM at 18-20.

Commerce explained that its analysis of the nature and the extent of production process and

facilities in the UAE is tied to the level of investment.  IDM at 18.  Thus, much of Commerce's

analysis in the preceding section discussing the UAE companies' level of investment to complete

CORE, is also relevant for Commerce's analysis under these statutory prongs.  *Id.*

In addition, Commerce specifically examined AGIS's facilities, and its production

process to finish hot-rolled steel and/or cold-rolled steel into CORE, and determined they are

minor when compared to the equipment and production processes used in making the hot-rolled

steel and/or cold-rolled steel inputs in China.  IDM at 8, 17-19; PDM at 18-19; Prelim Analysis

Mem. at 3.  In reaching this determination, Commerce considered that AGIS manufactures

CORE with several production lines at various stages, including pickling, cold-rolling mill, and

two galvanizing lines.  Commerce acknowledged that AGIS cuts the input steel, dips it in

hydrochloric acid, rinses it with water, and dries it.  Prelim Analysis Mem. at 3.  AGIS then runs

the coil through a machine that controls the steel's thickness and completes the galvanizing

process by coating the steel with zinc.  *Id.*  These final stages of CORE production performed in

the UAE (*i.e.,* finishing, cold-rolling, and galvanizing the hot-rolled steel and/or cold-rolled steel input), Commerce reasoned, are minor when compared to the production steps required to manufacture CORE performed in China (*i.e.,* the production of the hot-rolled steel and/or cold-rolled steel input).  IDM at 19; PDM at 20.  Specifically, Commerce found that the production stages performed in China—including the making of steel, the slab casting, and hot-rolling the steel—are more numerous and technologically complex than the production steps of finishing and coating the hot-rolled steel and/or cold-rolled steel substrate into CORE.  IDM at 18.

This finding is consistent with Commerce's previous determinations in several circumvention cases involving CORE, as well as evidence indicating that the CORE production process is similar from country to country.  *Id.* at 19 (citing ITC CORE Report at I-17-22 and II-27); *see also* PDM at 19.  For example, in the *China/Vietnam CORE Final Determination*, which involves another circumvention inquiry of the *China CORE Orders* at issue in this case, Commerce analyzed the nature of the production process in Vietnam by comparing the cold-rolling and galvanizing operations in Vietnam to the process of producing hot-rolled steel and cold-rolled steel in China.  *China/Vietnam CORE Final Determination*, 83 Fed. Reg. 23,895 (Dep't Commerce May 23, 2018), and accompanying IDM at 41.  In that proceeding, Commerce found that "{c}ompared to the production steps required to produce {hot-rolled steel}, or to the entire process of producing CORE from iron ore, the production process and facilities used to complete the final finishing processes of cold-rolling {hot-rolled steel} to produce {cold-rolled steel} and then galvanizing it to produce CORE is comparatively minor."  *Id.*; *see also* PDM at 18 (discussing same).  This makes sense because the vast majority of production activities necessary to produce CORE occur at earlier stages in the CORE production process, including at the molten steel, semi-finished steel, and hot-rolling stages.  *See* PDM at 18.

28

Likewise, as set forth in the *China/Vietnam CORE Final Determination*, the materials, energy, labor, and capital equipment used to complete CORE are not substantial relative to the materials, energy, labor, and capital equipment used by hot-rolled steel suppliers in production of the input.  PDM at 18; IDM at 8, 18-20 (citing *China/Vietnam CORE Prelim. Determination*, 82 Fed. Reg. 58,170 (Dep't Commerce Dec. 11, 2017), and accompanying PDM at 21 (unchanged in *China/Vietnam CORE Final Determination*, 83 Fed. Reg. 23,895 (Dep't Commerce May 23, 2018), and accompanying IDM at 9)).

Commerce reasonably rejected AGIS's claim that AGIS is differently situated insofar as AGIS purports to employ labor to produce CORE that is relatively skilled.  *See* AGIS Br. at 13, 15-16.  As Commerce explained, however, the record did not support AGIS's claim that its labor is more skilled than that employed by other CORE producers.  IDM at 19.  In any event, even if AGIS's labor is relatively skilled, labor is also included by Commerce as a measurement of the cost of processing the steel input into CORE relative to the cost of production of the input itself. *Id.*  Thus, given evidence that the production process of CORE does not differ by country, and Commerce's evaluation of the materials, energy, labor, and capital equipment used to complete CORE in the UAE, Commerce reasonably determined that the nature of the production process and extent of facilities used to complete CORE in the UAE is minor.

Finally, Commerce also relied on two additional circumvention determinations involving similar antidumping or countervailing duty orders on CORE from Korea and Taiwan, in which Commerce reached analogous determinations regarding the factors under 19 U.S.C. §§ 1677j(b)(2)(C) and (b)(2)(D).  Specifically, in the *Korea/Vietnam CORE Final Determination* and the *Taiwan/Vietnam CORE Final Determination*, Commerce found that the CORE manufacturing process occurring in the third country (*i.e.*, Vietnam) represents a relatively minor

portion of the overall manufacturing of finished CORE in terms of the process involved.  IDM at

19 (discussing *Korea/Vietnam CORE Final Determination*, 84 Fed. Reg. 70,948 (Dep't

Commerce Dec. 26, 2019); *Taiwan/Vietnam CORE Final Determination*, 84 Fed. Reg. 70,937

(Dep't Commerce Dec. 26, 2019)).  Given evidence on the record that the production process

does not differ by country, Commerce reasonably relied on these findings, as well, to reach its

determination that the finishing processes conducted in the UAE are minor when compared to

the overall CORE manufacturing process from start to finish.

AGIS argues that when Congress adopted its 1994 amendments to the circumvention

provisions in the statute, Congress was concerned with the establishment of minor or

"screwdriver" assembly operations.  AGIS Br. at 22-23.  AGIS argues that Congress did not

intend to expand the scope of an antidumping or countervailing duty order to cover well-

established operations in non-subject countries that existed prior to the relevant antidumping or

countervailing duty investigations.  *Id.*  We do not dispute that Congress was concerned with the

establishment of minor or screwdriver operations, which is a reason why Congress authorized

Commerce "to apply antidumping and countervailing duty orders in such a way as to prevent

circumvention and diversion of U.S. law," and provided for the "aggressive implementation" of

circumvention laws.  Omnibus Trade Act of 1987, S. Rep. No. 100-71, at 100-101 (1987).

AGIS fails to recognize, however, that what may constitute a minor operation is variable

depending on the product at issue.  As AGIS points out, a minor production process can include

cutting jumbo tissue paper rolls into cut-to-length sheets of paper, AGIS Br. at 22 (citing *Certain

Tissue Paper Products from the People's Republic of China*, 78 Fed. Reg. 14,514 (Dep't

Commerce Mar. 6, 2013) (preliminary circumvention determination)); however, a minor

production process can also include a more extensive operation that is nonetheless "minor" when

considering the overall production of the product (*e.g.,* the finishing process for completing CORE when considering the overall production process, as detailed above).

The statute provides that Commerce shall consider five sub-factors under 19 U.S.C. § 1677j(b)(2) when determining whether the process of assembly or completion is "minor or insignificant" under 19 U.S.C. § 1677j(b)(1)(C). Commerce considered all five of these sub-factors in its review of CORE production in this case, and reasonably determined that the process of assembly or completion of CORE in the UAE is minor.

      C.      The Value Added By Processing Steel Input Into CORE In The UAE Represents A
              Small Proportion Of The Value Of The CORE Imported Into The United States

Commerce reasonably determined, pursuant to 19 U.S.C. § 1677j(b)(2)(E), that CORE processing performed in the UAE represents a small proportion of the value of the CORE imported into the United States. IDM at 17-20; PDM at 20-22. In evaluating this factor, Commerce conducted qualitative and quantitative analyses.

Commerce opened its qualitative analysis with observations regarding its statutory duty. Commerce explained that Congress directs the agency to focus more on the nature of the production process and less on the difference between the value of the subject merchandise and the value of the parts and components imported into the processing country. IDM at 18-20; PDM at 20 (citing analyses in several prior administrative reviews). This conclusion is supported by the legislative history, which provides:

> Accordingly, **section 230 amends {19 U.S.C. §§ 1677j(b)} to shift the focus of the {circumvention} inquiry away from a test of the difference in value between the subject merchandise and the imported parts or components toward the nature of the process performed in the . . . third country . . . .** With respect to the second inquiry regarding the value of the parts or components produced in the foreign country, the Committee does not, with this new formulation, intend to replace one problematic test-the "small" value test-with another. **The Committee expects and**

> **intends that the new standard will be less difficult to meet, thereby improving our ability to prevent circumvention. It also recognizes the need for flexibility in administering this standard.  Thus, the bill does not to establish a rigid numerical standard for determining "significance"** nor does the Committee expect Commerce to establish a specific numerical test.  The determination of whether the value of the parts or components is a significant portion of the total value of the merchandise should be made on a case-by-case basis, looking at the totality of the circumstances.

*See* Uruguay Round Agreements Act, S. Rep. No. 103-412, at 81-82 (1994) (emphasis added).

Consistent with this congressional intent, Commerce turned to an analysis of the nature of the production process in the UAE as part of its analysis of the value added factor.  Commerce found that at least some of the direct material inputs (*i.e.*, hot-rolled steel and/or cold-rolled steel) completed into CORE in the UAE were manufactured and supplied by producers in China.  *See* IDM at 17; PDM at 20 (citing AGIS IQR at 6-7 and Exhibit 7; AGIS SQR at 2).  Commerce further found, consistent with its analysis under other statutory factors, that the nature of the production process to complete CORE in the UAE is minor and AGIS did not add significant processing value to the substrate input in AGIS's production of CORE.  IDM at 18-19; PDM at 20 (citing Prelim. Analysis Mem.).  Thus, consistent with Congressional intent and with Commerce's analysis of the minor processing that occurs in the UAE to complete CORE, Commerce found that value added by the materials, labor, energy, overhead and other items consumed by AGIS in the production of CORE represents an insignificant value when compared to the value of the merchandise sold to the United States.  IDM at 19; PDM at 20.

Commerce conducted a quantitative analysis as well.  IDM at 20 (citing Final Analysis Mem.); PDM at 20-21.  It did so by calculating a value-added percentage,[3] which compares the

---

[3]  To calculate the value-added percentage, Commerce first calculated AGIS's further processing cost to make CORE, which is equal to AGIS's total cost minus the direct material

value added by processing performed in the UAE to the value of the merchandise imported into the United States.  IDM at 20-21; PDM at 21; Final Analysis Mem. at 2-4; Prelim Analysis Mem. at 4-5.  After evaluating the results of its calculation, Commerce determined that the value added by AGIS comprises only a small proportion of the total export value.  IDM at 20-21; Final Analysis Mem. at 2-4; Prelim Analysis Mem. at 4-5.  Specifically, in the preliminary results, Commerce calculated a value-added percentage of processing cold-rolled steel and hot-rolled steel into CORE in the UAE of [███████████████████].  Prelim Analysis Mem. at 4-5.  Commerce found that this value added by AGIS in the UAE comprises a small proportion of the total value of the merchandise imported into the United States.  *Id*.

In the final results, Commerce considered AGIS's argument that Commerce should add profit, financial expenses, and SG&A costs to the value-added percentage formula.  IDM at 20; Final Analysis Mem. at 2-4.  However, in recalculating the value-added percentage to factor these additional costs, Commerce found that the processing of cold-rolled steel and hot-rolled steel into CORE in the UAE was [████████████████████].  *Id.*  Despite AGIS's argument that Commerce said nothing regarding the impact of revised calculations, Commerce did, in fact, explain that "even if AGIS's profit, financial expenses, and SG&A were added to the value-added percentage calculation, *the percentage of value added does not materially change*, and thus the cost of processing {cold-rolled steel} and {hot-rolled steel} would still be much greater than the cost of processing CORE in the UAE."  IDM at 20 (emphasis added).  Thus,

---

cost of the hot-rolled steel or cold-rolled steel substrate.  *See* Final Analysis Mem. at 2-4; Prelim Analysis Mem. at 4-5.  Commerce calculated the total cost to include direct material cost, labor, manufacturing overhead, packing costs.  Prelim Analysis Mem. at 4.  In the *Final Results*, Commerce considered AGIS's argument that Commerce should add profit, financial expenses, and sales, general and administrative (SG&A) costs in AGIS's total cost value.  IDM at 20; Final Analysis Mem. at 2-3.  The value-added percentage is equal to AGIS's further processing cost (*i.e.,* AGIS's total cost minus the direct material cost of hot-rolled steel and/or cold-rolled steel) divided by the average U.S. sales price of CORE.

regardless of whether the agency included profit, financial expenses, and SG&A costs in its value added percentage formula, the value added by the processing performed in the UAE is a small proportion of the total value of the merchandise imported into the United States. *Id.*

In addition to the above analysis, Commerce also considered its prior circumvention determinations, which lend additional support for the agency's finding that the value added is relatively insignificant. IDM at 21 (citing *China/Vietnam CORE Final Determination*, 83 Fed. Reg. 23,895 (Dep't Commerce May 23, 2018); *Korea/Vietnam CORE Final Determination*, 84 Fed. Reg. 70,948 (Dep't Commerce Dec. 26, 2019); and *Taiwan/Vietnam CORE Final Determination*, 84 Fed. Reg. 70,937 (Dep't Commerce Dec. 26, 2019) (all finding that the completion process performed in Vietnam represents a small proportion of the value of CORE imported into the United States)); PDM at 21 (citing same). Combined with evidence that "CORE is produced using common equipment and processes, regardless of the country in which it is produced," the record reflects that Commerce reasonably relied on these prior determinations for additional support for its value-added conclusions. PDM at 21 (citing ITC CORE Report at I-17-22).

Finally, Commerce also considered pricing information data in the ITC CORE Report, which was sourced from MEPS. IDM at 22 (citing PDM at 21-22 (citing ITC CORE Report at Tab VII-33)). The data indicate that, between January 2013 and February 2016, the price of hot-rolled steel was approximately 69 percent to 79 percent of the price of CORE, and the price of cold-rolled steel was approximately 84 to 90 percent of the price of CORE. Thus, during the review period, the value-added by CORE producers in third-countries, like the UAE, is approximately 10 to 31 percent depending on whether the underlying input was already cold-rolled. Commerce also considered MEPS data between January 2018 through December 2018,

which was the most recent contemporaneous, publicly-available data.  *Id.* (citing PDM at 21-22

(citing Initiation Mem. at Ex. 11 (MEPS Value of Processing data), AD P.R. 15, CVD P.R. 15)).

The data indicate that the value of hot-rolled steel and cold-rolled steel is approximately 78 to 87

percent of the total value of CORE, respectively.  This means the value of processing to produce

CORE from cold-rolled steel and hot-rolled steel is approximately 13 percent and 22 percent,

respectively.  These data further support Commerce's determination that the value added of

processing CORE in the UAE is an insignificant proportion of the value of CORE imported into

the United States.

AGIS argues that Commerce inadequately explained its conclusions with respect to value

added.  AGIS Br. at 26-29.  However, as reflected above, Commerce did support its conclusions

with a reasoned analysis.  Commerce discussed and engaged in value added calculation.  IDM at

20; Final Analysis Mem.  Commerce also relied on its analysis of the nature of the production

process in the UAE; its prior determinations analyzing this factor in analogous circumvention

inquiries; and pricing information from MEPS and the ITC CORE Report.  *See* IDM at 17-21;

PDM at 22-23.

AGIS also complains that Commerce failed to adopt AGIS's preferred value-added

calculation, which it had presented to Commerce for its consideration.  AGIS Br. at 30.

However, Commerce provided a reasoned basis for the formula it did use and its reasons for not

employing the formula favored by AGIS.  IDM at 20-22; PDM at 22.  Moreover, the statute, as

Commerce observed, does not require the use of AGIS's preferred formula and Commerce was

not otherwise somehow obliged to use it.  Commerce provided a reasonable and record-based

explanation for its use and calculation of the value-added percentage to evaluate this factor.

AGIS cites to *Peer Bearing Co.-Changshan v. United States*, 128 F. Supp. 3d 1286 (Ct.

Int'l Trade 2015), as support for its argument that the value added in the UAE should have been recognized as significant.  AGIS Br. at 29-30.  AGIS highlights that in *Peer Bearing Co.-Changshan*, Commerce conducted a substantial transformation analysis and determined that 38 percent of the total cost of manufacture was a consideration that supported a finding of substantial transformation.  128 F. Supp. 2d at 1291.  However, this case is inapposite because it does not involve a circumvention inquiry or Commerce's analysis of the relevant factor under 19 U.S.C. § 1677j(b)(2)(E).

Reliance on this Court's *Bell Supply Co., LLC*, 348 F. Supp. 3d 1281, is similarly misplaced.  *See* AGIS Br. at 29-30.  In *Bell Supply*, the Court held that Commerce did not provide sufficient explanation for its conclusion that the value-added percentage was insignificant.  As already discussed, however, *Bell Supply*, like *Peer Bearing*, is not relevant in this context because the case did not involve Commerce's analysis under 19 U.S.C. § 1677j(b)(2)(E) in a circumvention inquiry.  Moreover, in contrast to the facts in *Bell Supply*, Commerce in this case provided a robust analysis under this factor and thereby supported its conclusion that the value added in the UAE is insignificant.

Additionally, as discussed above, Congress did not intend for the standard under the relevant factor in this case, 19 U.S.C. § 1677j(b)(2)(E), to be either difficult to meet or the measure of "a rigid numerical standard for determining 'significance.'"  *See* Uruguay Round Agreements Act, S. Rep. No. 103-412, at 81-82 (1994).  Congress stated that "{t}he determination of whether the value of the parts or components is a significant portion of the total value of the merchandise should be made on a case-by-case basis, looking at the totality of the circumstances," which is precisely what Commerce did in this case.  *See id.*

Thus, Commerce's finding that the value added by the processing performed in the UAE is a small proportion of the value of the merchandise imported into the United States is supported by substantial evidence and not contrary to law. *See* 19 U.S.C. § 1677j(b)(2)(E). In further summary, Commerce's analysis of all five statutory factors, pursuant to 19 U.S.C. § 1677j(b)(2)(A)-(E), and its resulting conclusion that the process of assembly or completion in the UAE is minor or insignificant, pursuant to 19 U.S.C. § 1677j(b)(1)(C), is supported by substantial evidence and not contrary to law.

IV.  **Commerce's Use Of Surrogate Values In The Circumvention Analysis Is Supported By Substantial Evidence And Not Contrary To Law**

AGIS argues that it is not appropriate for Commerce to use surrogate prices to value the hot-rolled steel and cold-rolled steel input used by AGIS to complete the production of CORE. *See* AGIS Br. 16, 31-34. Commerce is justified, however, in relying on a surrogate valuation and, correspondingly, having not relied on Chinese input prices as part of its analysis under 19 U.S.C. § 1677j(b)(1)(D). IDM at 21; PDM at 4-5, 8-9, 22-23.

First, Commerce's use of surrogate values in its circumvention analysis under 19 U.S.C. § 1677j(b)(1)(D), is not contrary to law. The Court has previously sustained Commerce's use of surrogate values in circumvention inquiries because it reflects Commerce's reasonable construction of the statute. *See U.K. Carbon and Graphite Co., Ltd. v. United States*, 931 F. Supp. 2d 1322, 1311-12 (Ct. Int'l Trade 2013). As Commerce has further explained, Congress requires the agency to determine, pursuant to 19 U.S.C. § 1677j(b)(1)(D), "whether the *value* of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the total value of the merchandise exported to the United States." (emphasis added). However, section 1677j does not define "value" and the statute is otherwise silent as to any particular method Commerce must use in assessing "value." Congress has

therefore "explicitly left a gap for the agency to fill," and the Court should defer to Commerce's interpretation of the term provided that interpretation is based on a reasonable construction of the statute. *Chevron*, 467 U.S. at 843-44; *U.K. Carbon and Graphite*, 931 F. Supp. 2d at 1311-12.

Additionally, as the "'master' of antidumping law," Commerce has expertise in development of valuation methodologies. *See Consumer Prods. Div., SCM Corp. v. Silver Reed Am., Inc.*, 753 F.2d 1033, 1039 (Fed. Cir. 1985); *Thai Pineapple Pub. Co. v. United States*, 187 F.3d 1362, 1365 (Fed. Cir. 1999) (internal citations omitted)). This valuation "turn{s} on complex economic and accounting inquiries" in which the courts have little expertise. *Fujitsu*, 88 F.3d at 1044.

Commerce reasonably interprets the "value" determination, required by section 1677j(b)(1)(D), to permit Commerce's use of surrogate values when the "foreign country" is a non-market economy country. As Commerce explained, its analysis of this factor "requires an exercise that is similar to the determination of normal value in Commerce's typical {antidumping duty} methodology for price comparison purposes." PDM at 8. It is also well-established that, in antidumping duty proceedings involving imports from non-market economies, section 1677b(c)(1) directs Commerce to base normal value, in most cases, on the producer's factors of production, valued in a surrogate market economy country that the agency considers appropriate. Surrogate values are needed because "{non-market economy} costs and prices are inherently unreliable." IDM at 21; PDM at 8.

In this review, Commerce determined that the same concerns about reliability of non-market economy prices that underlie its normal value calculation also underlie its analysis of circumvention of an order imposed upon non-market economy-origin merchandise. IDM at 21; PDM at 8. Specifically, Commerce explained:

> As stated in the Preliminary Determination, consistent with prior cases, we find that using {surrogate values} in this case is appropriate because, although actual prices paid for China-produced inputs are typically used in the cost buildup in {market economy} proceedings, the instant inquiries are {circumvention} proceedings initiated under the China CORE Orders, which are {non-market economy} proceedings.  In the instant case, we are attempting to determine whether Chinese-produced merchandise is being sold to the United States in circumvention of the China CORE Orders, which requires an analysis of certain input costs.  That analysis of the respondent's Chinese-origin input costs appropriately falls under the purview of Commerce's {non-market economy} methodology . . . .

> Therefore, based on our requirement to calculate the most accurate result, we used {a non-market economy} methodology.  Further, AGIS did not cite to any instance where Commerce or any Court ruled it contrary to the {Tariff} Act or to any Commerce regulations stating that it needs to value the cost of a Chinese-sourced input based on {a market economy} methodology.  In fact, as indicated in the Preliminary Determination, Commerce has used a {surrogate value}methodology in prior circumvention analyses involving NME countries.

IDM at 21 (citations omitted).

Accordingly, because Commerce determined that it cannot use the non-market economy sales, it instead looked to surrogate values to calculate the "value of the merchandise" from non-market economy countries, pursuant to 19 U.S.C. § 1677j(b)(1)(D).  IDM at 21; PDM at 8.  This reasonable construction of the statute is entitled to deference, as this Court has so held.  *See U.K. Carbon and Graphite*, 931 F. Supp. 2d at 1311-12*; Suramerica de Aleaciones Laminadas*, 966 F.2d at 665.

In the circumvention inquiry at issue in *U.K. Carbon and Graphite*, Commerce found that artificial graphite rods sourced from China and completed or assembled into small diameter graphite electrodes in the United Kingdom were circumventing the order on small diameter graphite electrodes from China.  As in *U.K. Carbon and Graphite Co., Ltd.*, this case also involves inputs from China, a non-market economy, being completed or assembled in the UAE

that (like the United Kingdom) is a market economy country.  In *U.K. Carbon and Graphite*, the Court deferred to "Commerce's decision to use a surrogate value methodology in determining the value of inputs from a {non-market economy} country in {a circumvention} inquiry, because it is a reasonable construction of the statute." *Id.*  Thus, as the Court did in *U.K. Carbon and Graphite*, the Court should sustain Commerce's reasonable decision to use surrogate values in its circumvention analysis under 19 U.S.C. § 1677j(b)(1)(D) in this case as well.

AGIS contends that Commerce's non-market economy surrogate value methodology is not appropriate because the UAE is a market economy country.  AGIS Br. at 33.  Commerce allegedly should have relied on the actual prices paid by AGIS for the Chinese hot-rolled steel and cold-rolled steel inputs because (i) Commerce relies on actual export prices paid to Chinese exporters in non-market economy cases and (ii) Commerce never indicated that the prices AGIS paid for hot-rolled steel and cold-rolled steel inputs were not market-economy prices.  *Id.*  Commerce explicitly determined, however, that the non-market economy sales prices were not usable given that non-market economy costs and prices are "inherently unreliable."  IDM at 21.

Additionally, Commerce further explained, "although actual prices paid for China-produced inputs are typically used in the cost buildup in {market-economy} proceedings, the instant inquiries are {circumvention} proceedings initiated under the China CORE Orders, which are {non-market economy} proceedings."  IDM at 21.  Commerce is determining whether Chinese-produced merchandise is being sold to the United States in circumvention of the China CORE Orders.  *Id.*  Thus, the underlying premise of Commerce's circumvention inquiry is that the CORE finished by AGIS in the UAE is really subject merchandise exported to the United States from China after final processing in the UAE.  *Id.*

V.    Commerce Did Not Err In Its Consideration Of Pattern Of Trade

The statute directs Commerce to consider three additional factors in determining whether

merchandise assembled or completed in a foreign country is circumventing an order:  (1) the

pattern of trade, including sourcing patterns; (2) affiliations between the manufacturer or

exporter of subject merchandise with the entity assembling or completing the merchandise in the

third country; and (3) whether imports into the foreign country have increased after initiation of

the investigation that resulted in the issuance of an order.  19 U.S.C. § 1677j(b)(3).  As germane

to this appeal, Commerce did not err in its determination that trade pattern weighed in favor of a

circumvention determination.  IDM at 8-15; PDM at 23-24.

Commerce initiated the circumvention inquiry on a country-wide, not a company-

specific, basis.  IDM at 11; PDM at 2, 27; Initiation Mem. at 17-18.  AGIS does not challenge

Commerce's country-wide determination, but disagrees with the time periods Commerce elected

to examine and with Commerce's evaluation of AGIS specific production and shipment

information.  AGIS Br. at 34-37.  Contrary to AGIS's arguments, Commerce did not err in its

consideration of the pattern of trade factor.

In evaluating pattern of trade, Commerce compared data over a 98-month period between

June 2011 to July 2019.  IDM at 8, 12-13; PDM at 23-24.  Commerce selected this period

because it coincides with the 49-month period before Commerce initiated the underlying

antidumping and countervailing duty investigations on CORE from China (*i.e.,* June 2015), and

the 49-month period after Commerce initiated the investigations.  Based on a comparison of

these pre- and post-investigation time periods, Commerce discerned that the average monthly

volume of imports of hot-rolled steel and cold-rolled steel from China into the UAE rose by

35.01 percent and 47.01 percent, respectively.  IDM at 12 (citing PDM at 23-24).  At the same

time, imports of CORE from the UAE to the United States also rose significantly (over

5,000 percent).  IDM at 12 (citing same).  These increases, Commerce determined, support a

finding of circumvention.

Commerce also considered AGIS's specific import and export data to evaluate pattern of

trade during the same 98-month period, and found an increase in AGIS's sourcing of hot-rolled

steel and cold-rolled steel from China, and an overall increase in AGIS's exports of CORE to the

United States.  IDM at 12.  Specifically, Commerce found that AGIS's quantity of purchases of

hot-rolled steel and cold-rolled steel from China increased by [████████

████████] between the periods June 2011-June 2015 and July 2015-

July 2019.  Prelim Analysis Mem. at 7.  AGIS's exports of CORE using Chinese hot-rolled steel

and cold-rolled steel inputs to the United States also increased from [███████

███] between the periods June 2011-June 2015 and July 2015-July 2019.  *Id.* at 8.  Thus,

based on both country-wide record data, and data specific to AGIS, Commerce's conclusion that

the pattern of trade factor weighs toward circumvention is a conclusion supported by substantial

evidence and not contrary to law.

AGIS alleges that Commerce has arbitrarily cherry-picked the particular time periods

examined for this pattern of trade factor.  AGIS Br. at 34-35.  AGIS contends that, although the

statute directs Commerce to examine a period after the initiation of an investigation under

section 1677j(b)(3)(C), the statute does not similarly direct Commerce to compare a similar

period when examining pattern of trade under section 1677j(b)(3)(A).  However, as AGIS also

admits, the statute does not identify any particular time periods for Commerce to consider the

pattern of trade factor.  *See* AGIS Br. at 34.  As discussed above, when the statute is silent as to

a particular method that must be used, "Congress has explicitly left a gap for the agency to fill,"

and the Court must defer to Commerce's interpretation if based upon a reasonable construction of the statute.  *Chevron*, 467 U.S. at 843-44.

Commerce reasonably selected the 49-month periods prior to and after its initiation of the underlying antidumping and countervailing duty investigations as the appropriate periods to examine.  IDM at 12-13.  The selection periods were not arbitrary.  Commerce explained that each period keys off the initiation of the underlying investigations and also takes into account the date of the preliminary determination in the antidumping duty investigation.  IDM at 13.  Commerce explained that "{t}hese periods allow{} Commerce to compare the trade patterns prior to the discipline of any {antidumping and countervailing} duties with the trade patterns present when parties were aware that they could potentially have to pay {antidumping and countervailing} duties."  *Id.*

Additionally, Commerce's selection of the time periods for examination is consistent with its examination of similar periods in other cases.  *See, e.g., China/Vietnam CORE Final Determination*, 83 Fed. Reg. 23,895 (Dep't Commerce May 23, 2018), and accompanying IDM at 47-48.  Commerce's selection of time periods is reasonable interpretation of the statute, entitled to deference, and supported by substantial evidence.

AGIS argues that it decreased its shipments of CORE containing Chinese-origin hot-rolled steel and cold-rolled steel to the United States during the three years following the publication of the China CORE Orders, and that since December 2017, it has not shipped CORE containing Chinese-origin hot-rolled steel and cold-rolled steel to the United States.  AGIS Br. 35-36. Commerce considered this argument and found that AGIS had nonetheless shipped CORE containing Chinese-origin hot-rolled steel and cold-rolled steel after the China CORE Orders were published.  IDM at 13.  Commerce highlighted that AGIS continued shipping CORE

containing Chinese-origin hot-rolled steel and cold-rolled steel to the United States until

December 2017, which was over a year after the China CORE Orders went into effect in July

2016.[4]  *Id.*

Moreover, AGIS does not meaningfully address Commerce's analysis of country-wide

trade patterns, which also support Commerce's circumvention decision.  Specifically, Commerce

found that there was a country-wide pattern of trade in the UAE, during the review periods, that

reflects a large surge of imports of Chinese-origin cold-rolled steel and hot-rolled steel into the

UAE, as well as a significant rise in imports into the United States of CORE from the UAE.  *Id.*

(citing PDM at 23-24).  Commerce's pattern of trade analysis is supported by substantial

evidence and not contrary to law

## **CONCLUSION**

For these reasons, defendant respectfully requests that the Court deny AGIS's motion for

judgment on the agency record and sustain Commerce's final determination of circumvention in

its entirety.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

*/s/Claudia Burke*
CLAUDIA BURKE
Assistant Director

---

[4]  Commerce initiated the underlying antidumping and countervailing duty investigations
in June 2015.  Thus, when compared to that date, AGIS continued exporting CORE containing
Chinese-origin hot-rolled steel and cold-rolled steel to the United States for two and a half years
after Commerce initiated the underlying investigations.

/s/Mollie L. Finnan

OF COUNSEL:                                    MOLLIE L. FINNAN
ELIO GONZALEZ                                  Senior Trial Counsel
Senior Attorney                                U.S. Department of Justice
U.S. Department of Commerce                    Civil Division
Office of the Chief Counsel                    Commercial Litigation Branch
    for Trade Enforcement and Compliance   P.O. Box 480, Ben Franklin Station
Washington, D.C.                               Washington, D.C. 20044
                                               Telephone: (202) 353-0897
                                               E-mail: Mollie.L.Finnan@usdoj.gov


April 14, 2021                                 *Attorneys for Defendant*

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that "Defendant's Response To Plaintiffs' Rule 56.2 Motion For Judgment On The Agency Record" complies with the word-count limitation set forth in Standard Chambers Procedure ¶ 2(B)(1).  In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.  According to the word count, this brief contains <u>13,607</u> words.

<i>/s/Mollie L. Finnan</i><br>MOLLIE L. FINNAN

April 14, 2021

## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| AL GHURAIR IRON & STEEL LLC, | ) |
| *Plaintiff,* | ) |
| v. | ) |
| UNITED STATES, | )  Court No. 20-00142 |
| *Defendant,* | ) |
| and | ) |
| UNITED STATES STEEL CORPORATION, NUCOR CORPORATION, and STEEL DYNAMICS, INC., | ) |
| *Defendant-Intervenors.* | ) |

<u>ORDER</u>

Upon consideration of plaintiff's Rule 56.2 motion for judgment on the agency record, defendant's response, plaintiffs' reply, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion is denied, and it is further

ORDERED that the final results of the United States Department of Commerce are sustained in their entirety, and it is further

ORDERED that final judgment shall enter in favor of the United States.


Dated _____                    _____
        New York, N.Y.                                              Judge