# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| AL GHURAIR IRON & STEEL LLC, | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Court No. 20-00142 |
| Defendant, | PUBLIC VERSION |
| and | |
| UNITED STATES STEEL CORPORATION, NUCOR CORPORATION, and STEEL DYNAMICS, INC., | |
| Defendant-Intervenors. | |

## REPLY BRIEF OF PLAINTIFF
## AL GHURAIR IRON & STEEL LLC,

Submitted by:

Robert G. Gosselink
Jonathan M. Freed

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
Tel.: (202) 223-3760

*Counsel to Al Ghurair Iron & Steel LLC*
*Plaintiff*

Dated: May 28, 2021

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

I.    INTRODUCTION ...............................................................................................1

II.   ARGUMENT.......................................................................................................2

      A.    Defendant Fails to Explain Commerce's Use of an Unreasonable Investment
            Comparison Methodology .......................................................................................2

      B.    Defendant Fails to Explain Why Commerce's Value-Added Calculations Are
            Supported by Substantial Evidence .......................................................................9

      C.    Defendant Fails to Show How Commerce's Valuation of Chinese HRS and CRS
            Substrate Using Surrogate Values Was in Accordance With Law ........................14

      D.    Defendant Fails to Demonstrate That Commerce's Reliance on Only a Single
            Pattern of Trade Was Reasonable ........................................................................16

VI.   CONCLUSION.................................................................................................19

# TABLE OF AUTHORITIES

## Judicial Precedent

*Dorbest v. United States,* 30 C.I.T. 1671, 462 F. Supp. 2d 1262 (2006) ...................................... 10

*Goldlink Indus. Co. v. United States,* 30 C.I.T. 616, 431 F. Supp. 2d. 1323 (2006) ..................... 10

*U.K. Carbon and Graphite Co., Ltd. v. United States*, 931 F. Supp. 2d 1322
(Ct. Int'l Trade 2013) ...................................................................................................................... 15

*Universal Camera Corp. v. NLRB,* 340 U.S. 474 (1951) ............................................................... 13


## Statutes

19 U.S.C.§1677j(b) ...................................................................................................................*passim*


## Administrative Determinations

*Certain Cold-Rolled Steel Flat Products from the People's Republic of China: Final Affirmative
Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 32721 (May 24, 2016) ................ 7

*Certain Corrosion-Resistant Steel Products From the People's Republic of China: Affirmative
Final Determination of Circumvention Involving the United Arab Emirates*, 85 Fed. Reg. 41,957
(July 13, 2020) ................................................................................................................................. 3

*Certain Corrosion-Resistant Steel Products From Taiwan: Affirmative Final
Determination of Circumvention Inquiry on the Antidumping Duty Order*, 84 Fed.
Reg. 70937 (December 26, 2019) ..................................................................................................... 8

*Certain Corrosion-Resistant Steel Products From Korea: Affirmative Final
Determination of Circumvention Inquiry on the Antidumping Duty Order*, 84 Fed.
Reg. 70948 (December 26, 2019) ..................................................................................................... 8

*Certain Corrosion-Resistant Steel Products From China: Affirmative Final
Determination of Circumvention Inquiry on the Antidumping Duty Order*, 83 Fed.
Reg. 23895 (May 23, 2018) .............................................................................................................. 8

*Certain Corrosion-Resistant Steel Products From the People's Republic of China:
Final Determination of Sales at Less Than Fair Value, and Final Affirmative Critical
Circumstances Determination, in Part*, 81 Fed. Reg. 35316 (June 2, 2016) ............................. 3-4

*Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From
the People's Republic of China: Final Affirmative Determination,* and *Final Affirmative*

*Critical Circumstances Determination, in Part*, 81 Fed. Reg. 35308 (June 2, 2016) .....................4

*Hot-Rolled Lead and Bismuth Carbon Steel Products From Germany and the United Kingdom; Negative Final Determinations of Circumvention of Antidumping and Countervailing Duty Orders*, 64 Fed. Reg. 40336 (July 26, 1999) ........................................... 4-5

*Notice of Final Determination of Sales at Less Than Fair Value: Hot-Rolled Carbon Steel Flat Products From the People's Republic of China*, 66 Fed. Reg. 49632 (Sept. 28, 2001) ..........7

*Polyethylene Retail Carrier Bags from Taiwan*, 79 Fed. Reg. 31302 (June 2, 2014).................5, 6

*Small Diameter Graphite Electrodes from China*, 77 Fed. Reg. 33,405 (June 6, 2012).............5, 6

## REPLY BRIEF OF PLAINTIFF
## AL GHURAIR IRON & STEEL LLC

## I.   INTRODUCTION

Plaintiff, Al Ghurair Iron & Steel LLC ("AGIS"), a producer and exporter of corrosion-resistant steel products ("CORE") from the United Arab Emirates, submits this reply to the April 14, 2021, response of Defendant, the United States, and the April 28, 2021, response of Defendant-Intervenor, Steel Dynamics, Inc. ("SDI"), which both respond to the claims raised by AGIS in its Rule 56.2 motion for judgment on the agency record. *See* Def.'s Resp. Pl.'s Mot. J. Upon Agency R. Confidential Version, April 14, 2021, ECF No. 42 ("Def. Resp. Br."), SDI's Resp. Opp'n Pl.'s Mot. J. Upon Agency R. Public Document, April 28, 2021, ECF No. 44 ("SDI Resp. Br."). AGIS's motion for judgment on the agency record contests various aspects of the U.S. Department of Commerce's final determination of circumvention of the antidumping duty and countervailing duty orders on corrosion-resistant steel products ("CORE") from the People's Republic of China. See Pl.'s Rule 56.2 Mot. J. Agency R., Jan. 26, 2021, ECF No. 34, Mem. Supp. Mot. Pl. AGIS J. Upon Agency R. Confidential Version, Jan. 26, 2021, ECF No. 36 ("AGIS Br."); *see also Certain Corrosion-Resistant Steel Products From the People's Republic of China: Affirmative Final Determination of Circumvention Involving the United Arab Emirates*, 85 Fed. Reg. 41,957 (July 13, 2020) (*"Final Determination"*), PR 150, and accompanying Issues and Decision Memorandum (July 6, 2020) ("IDM"), PR 148, and "Al Ghurair Iron & Steel LLC – Final Analysis Memorandum" (July 6, 2020) (*"AGIS Final Analysis"*), CR 88, and Attachment of Analysis Memorandum, CR 89.

First, neither Defendant nor SDI demonstrates that Commerce's determination that AGIS undertook minimal processing of hot-rolled steel ("HRS") and cold-rolled steel ("CRS") in the UAE to convert such steel to CORE was supported by substantial evidence because neither

Plaintiff's Reply Brief
Consol. Court No. 20-00142

*Public Version*

explains why Commerce did not need to consider conflicting record information that significantly detracted from Commerce's decision. Second, neither Defendant nor SDI demonstrates that Commerce did not commit legal error in its calculation of the value added by AGIS in the UAE to process HRS and CRS into CORE. Third, the response briefs do not demonstrate that Commerce was legally permitted to use a *third-country surrogate value* to value Chinese HRS and CRS rather than using the actual market economy purchase prices paid by AGIS to its suppliers for HRS and CRS material inputs. Fourth, the response briefs do not establish that AGIS's production shifted in response to the *China CORE Orders* or that AGIS's patterns of trade demonstrated that AGIS was circumventing the *China CORE Orders*. Plaintiff therefore respectfully reiterates its request that the Court remand the *Final Determination* for Commerce to reconsider the determinations challenged by Plaintiff.

## II.    ARGUMENT

### A.  Defendant Fails to Explain Commerce's Use of an Unreasonable Investment Comparison Methodology

Defendant argues that Commerce reasonably concluded that AGIS's level of investment in the UAE was minor based on a comparison of AGIS's investment in the production of CORE in the UAE to the level of investment required by Chinese producers of the HRS and CRS inputs used to produce CORE. Def. Resp. Br. 18. Specifically, Defendant justifies as reasonable Commerce's comparison of the "level of investments of fully integrated steel producers in China that produce the inputs (i.e., hot-rolled steel and/or cold rolled steel)" to the investment required in the UAE to produce CORE merchandise. Def. Resp. Br. 24-25. According to Commerce, this comparison allowed it to analyze "what portion of the total value of the merchandise is accounted for in the last step of processing," which Commerce claimed was "relevant to whether a producer would reasonably move its further processing across borders to avoid the discipline of

2

Plaintiff's Reply Brief
Consol. Court No. 20-00142

*Public Version*

the order." Def. Resp. Br. 19. Commerce's rationale is incorrect for two reasons. First, this

rationale presumes that producers of CORE must produce the HRS and CRS inputs that are used

in CORE production. Second, this rationale presumes that the production of HRS and CRS is

part of a continuum of production that necessarily results in the production of finished CORE

merchandise. Neither presumption is correct, and Commerce's comparison of the investment

required by an integrated Chinese of HRS and CRS inputs versus that required of a CORE

producer that manufactures CORE from HRS and CRS does not result in any meaningful or

rational evaluation.

   As explained in AGIS's Rule 56.2 Brief, it is well known that non-integrated production

mills that manufacture CORE from HRS and CRS constitute a key sector of the CORE

production industry. *See Certain Corrosion-Resistant Steel Products From China, India, Italy,*

*Korea, and Taiwan (Final)*, USITC Publication 4620 (July 2016) at Table III-1. Non-integrated

CORE mills do not have steel production; and thus the levels of investment by producers of the

upstream HRS and CRS inputs therefore have no relationship to, or any bearing on, a non-

integrated mill's investment in CORE production. As such, there was no basis for Commerce to

find that the level of investment in an integrated steel mill would inform a CORE producer's

decision to "move processing across a border." In the original antidumping duty and

countervailing duty investigations of CORE from China, Commerce did not individually

examine any Chinese producer of CORE that also produced HRS or CRS material inputs. *See*

*Certain Corrosion-Resistant Steel Products From the People's Republic of China: Final*

*Determination of Sales at Less Than Fair Value, and Final Affirmative Critical Circumstances*

*Determination, in Part*, 81 Fed. Reg. 35316 (June 2, 2016) (Issues and Decision Memorandum,

at Comment 3 (Commerce assigned surrogate costs to the HRS and CRS consumed by the

respondent CORE producer, Yieh Phui (China) Technomaterial Co., Ltd., because it was not an

integrated producer of the steel input); *see also Countervailing Duty Investigation of Certain*

*Corrosion-Resistant Steel Products From the People's Republic of China: Final Affirmative*

*Determination*, 81 Fed. Reg. 35308 (June 2, 2016). In fact, since the issuance of the *China*

*CORE Orders*, to the best of AGIS's knowledge, Commerce never has examined a Chinese

CORE producer that self-produced its own HRS and CRS inputs. Thus, there is no basis for

Defendant's insistence that "to understand the significance" of the comparison of levels of

investment, "it is important to start with an understanding of *the entirety of the production*

*process for CORE*." Def. Resp. Br. 19 (emphasis added). While fully integrated producers of

CORE exist, Commerce has not even once over the past five years actually faced the integrated

CORE production scenario that Defendant describes. In considering levels of investment,

Commerce completely disregarded that CORE manufacturing in China is performed by non-

integrated producers (identical to Plaintiff's production operations in the UAE), and Defendant

ignores this critical fact that undermines the rationale on which Commerce based its entire

investment comparison analysis.

Furthermore, as Commerce explained in *Hot-Rolled Lead and Bismuth Carbon Steel*

*Products From Germany and the United Kingdom; Negative Final Determinations of*

*Circumvention of Antidumping and Countervailing Duty Orders*, 64 Fed. Reg. 40336, 40345

(July 26, 1999) ("*Hot-Rolled Lead and Bismuth*"), "the petitioners' assertion that the U.S. re-

rollers' investment in rolling mills is small compared to its integrated mills' investment in the

United States is irrelevant because, here, we are only concerned with the investment required at a

rolling mill, a separate, recognized segment of the steelmaking industry."). Neither Defendant

nor Defendant-Intervenor addresses or explains Commerce's conclusion in the *Hot-Rolled Lead*

Plaintiff's Reply Brief
Consol. Court No. 20-00142

*Public Version*

*and Bismuth* circumvention determination, which directly contradicts the comparison approach

Commerce undertook in this case.[1]

Other agency practice also fails to support Commerce's investment comparison approach

in this case. In each case cited by Defendant, the nature of the production process is not relevant

to the facts here. Defendant cites *Polyethylene Retail Carrier Bags from Taiwan*, in which

Commerce compared the level of investment required of a Taiwanese producer to produce

polyethylene film tubes with the level of investment of a domestic producer in the United States

to convert the polyethylene tubes into finished subject merchandise. Def. Resp. Br. 18. In that

case, the unfinished polyethylene tubes subject to the circumvention inquiry "resemble in-scope

PCRBs in all respects, except they are in a continuous roll such that the bottoms are open and

they lack handles." *Polyethylene Retail Carrier Bags from Taiwan*, 79 Fed. Reg. 31302 (June 2,

2014) (Preliminary Decision Memorandum, at 1). Commerce determined that the unfinished

PRCB merchandise "is *intended* to be a PRCB covered by the scope of the order, and is

*dedicated* to PRCB use, as it has gone through every stage of the production process except for

the final steps of the production process." *Id.* at 5 (emphasis added). In *PRCBs from Taiwan*,

---

[1]  Defendant and Defendant-Intervenor also sidestep that the level of investment in UAE
production facilities actually was comparable to the level of investment of some Chinese
HRS producers. Plaintiff's position is that Commerce improperly compared the level of
investment in integrated Chinese steel mills to investments in CORE manufacturing facilities
in the UAE. Nonetheless, Commerce found that "the expenditure for construction of
integrated steel mills in China" was as low as $295 million and that "existing facilities with
both cold-rolling mills and galvanizing lines in the UAE were constructed with initial
investments of approximately $272 million," PDM, at 15, PR 121, and that AGIS's own
investments were [            ]. AGIS IQR, at 24-25, CR 8. Commerce's own findings
thus demonstrate that the investment in UAE CORE facilities is comparable to the capital
investment of certain Chinese producers of HRS. Commerce did not even address this
detracting factual information, however, and Defendant's unconvincing response is only that
the level of investment in the UAE is "still lower … when compared to the *average* level of
investment of integrated steel mills in China." Def. Resp. Br. 23 (emphasis added).

Plaintiff's Reply Brief
Consol. Court No. 20-00142

*Public Version*

Commerce's examination of the level of investment required to produce the polyethylene film

tubes was rational because the tubes could not be manufactured into anything else: the unfinished

PRCBs "represented an interruption in the continuous production process." *Id.* Because the

tubes could be further processed only into finished PRCBs, the capital investments in the first

stages and final processing step thus were relevant to "whether a producer would reasonably

move its further processing across borders to avoid the discipline of the order." The same cannot

be said of HRS and CRS produced in China, which are neither dedicated to, nor intended solely

for use in, the production of CORE, and which can be manufactured into countless other

downstream products. Because HRS and CRS inputs do not represent an interruption in the

continuous production process of CORE, producers of HRS and CRS do not face the question of

stopping production mid-stream and shifting the completion of semi-finished merchandise

dedicated to a particular finished product across borders to avoid the discipline of an AD or CVD

order. Commerce's comparison of investments in steel manufacturing to investments in CORE

manufacturing in this case therefore was not reasonable.

Defendant also cites *Small Diameter Graphite Electrodes from China* in which

Commerce compared the level of investment required for a Chinese manufacturer to produce an

unfinished graphitized electrode to the level of investment needed by a third-country producer to

perform its finishing operations. Def. Resp. Br. 18. Again, in that case, Commerce similarly

concluded that the merchandise subject to the circumvention inquiry was dedicated solely to

production of the in-scope merchandise:

> The totality of the procurement information on record clearly demonstrates that
> the inputs in question are either custom-ordered for the exact length, width,
> diameter, and chemical composition required by a customer's order of SDGE or
> as stock orders for industry-standard sizes of finished electrodes, and as such, the
> artificial graphite inputs are procured (and, thus, initially manufactured)
> specifically **for an intended end-use as finished SDGE**.

Plaintiff's Reply Brief
Consol. Court No. 20-00142

*Public Version*

*See Small Diameter Graphite Electrodes from China*, 77 Fed. Reg. 33,405 (June 6, 2012)

(Preliminary Decision Memorandum, at 8) (emphasis added). As with *PRCBs from Taiwan*,

Commerce's comparison in *SDGEs from China* of the investment required for production of the

unfinished graphitized electrodes to the investment required to finish the merchandise in a third

country again was reasonable because the unfinished electrodes could not be made into anything

other than the finished SDGE, and the levels of investments thus were relevant to "whether a

producer would reasonably move its further processing across borders." As explained above,

that question is not applicable in the present circumvention inquiry because HRS and CRS are

not produced with the specific intention of producing CORE. *See Final Determination of Sales

at Less Than Fair Value: Hot-Rolled Carbon Steel Flat Products From the People's Republic of

China*, 66 Fed. Reg. 49632 (Sept. 28, 2001); *Certain Cold-Rolled Steel Flat Products from the

People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*,

81 Fed. Reg. 32721 (May 24, 2016). Commerce's comparisons of investments in Chinese HRS

and CRS mills versus CORE facilities in the UAE therefore was irrelevant and unreasonable.

Factual situations in circumvention inquiries do not fit into a single box, and cannot all be

subject to the same circumvention analysis. Commerce is expected to examine circumvention on

a case-by-case basis. *See* SDI Resp. Br. 8 ("Congress intended to provide Commerce with the

discretion to adapt to different cases that present different factual situations.") (citation omitted).

Here, Defendant justifies Commerce's approach as being "consistent with its practice." Def.

Resp. Br. 19. But it is Commerce's rigid application of its test to the inappropriate factual

situation of this case that is the problem here. The rationale in *PRCBs from China* and *SDGEs

from China* that justified a comparison of investment levels "from the beginning of the

production process in the country subject to an order, to the total level of investment required to

**Plaintiff's Reply Brief**
**Consol. Court No. 20-00142**

*Public Version*

perform the finishing steps in the third country," Def. Resp. Br. 24, does not apply when the

upstream inputs are not dedicated to the production of the merchandise subject to the

circumvention inquiry and are not produced with the specific intention of producing the finished

downstream in-scope product. Without such dedication of use, the question of "whether a

producer would reasonably move its further processing across borders" simply is not relevant.

As explained in Plaintiff's Rule 56.2 brief, there is no evidence on the administrative record (1)

that HRS or CRS producers in China established operations in the UAE to manufacture CORE,

(2) that HRS or CRS producers in China had affiliated CORE producers in the UAE, or (3) that

AGIS's Chinese suppliers of HRS and CRS also produced CORE. There is no rational

relationship between the investment in HRS and CRS producers in China and the investment in

CORE production in the UAE. A circumvention determination must be based on more than

Commerce's speculation or theoretical concept that Chinese CORE producers would "move their

processing across borders." The facts in this case do not support Commerce's rationale, and the

conclusions Commerce made to justify its decision regarding whether AGIS's investments in

CORE production operations in the UAE was minor or significant therefore also fail, and the

Court should remand this issue to Commerce for further explanation and analysis.[2]

---

[2] Defendant also tries to justify Commerce's approach based on similar investment comparisons made by Commerce in the *China/Vietnam CORE Final Determination*, 83 Fed. Reg. 23895 (May 23, 2018), the *Korea/Vietnam CORE Final Determination*, 84 Fed. Reg. 70948 (Dec. 26, 2019), and the *Taiwan/Vietnam CORE Final Determination*, 84 Fed. Reg. 70937 (Dec. 26, 2019). *See* Def. Resp. Br. 28. But no party challenged Commerce's decisions in those cases to the Court, and they therefore have no authoritative value in this appeal. As Defendant admits, "Commerce's determinations in one circumvention inquiry are not binding on another." Def. Resp. Br. 22. Nevertheless, it is troubling for Defendant to claim that conclusions reached in other cases could be persuasive when "evidence suggests that the investment level and production process for completion of CORE does not vary significantly from country to country" when in fact there is no evidence in the administrative record for these claims whatsoever. Def. Resp. Br. 22-23.

Plaintiff's Reply Brief
Consol. Court No. 20-00142

*Public Version*

Last, Defendant and Defendant-Intervenor cite the statute to support the absence of "temporal boundaries" on Commerce's evaluation of the investment in facilities that produce the finished in-scope merchandise in third countries under 19 U.S.C. § 1677j(b), and suggest that Plaintiff's references to when AGIS established its operations introduce a condition not found in the statute. Def. Resp. Br. 24; SDI Resp. Br. 5. Plaintiff agrees that the statute does not limit Commerce's examination of when investment in production operations began. But when the entire basis for Commerce's investment comparison determination is to answer whether a producer would reasonably invest in facilities and "move its further processing across borders *to avoid the discipline of the order,*" Commerce necessarily considered the timing of the investments to be related to the timing of the *China CORE Orders.* In confirming that AGIS invested in CORE manufacturing in the UAE years before the *China CORE Orders* were in place, Plaintiff was simply answering the charge. To the degree Defendant and Defendant-Intervenor now believe that Commerce should not be considering "the time when a respondent's operations were first established," SDI Resp. Br. 5, they should have addressed their complaints to Commerce and not to the Court.

## B. Defendant Fails to Explain Why Commerce's Value-Added Calculations Are Supported by Substantial Evidence

The administrative record unequivocally establishes that Commerce provided no support or explanation for its determination that the value added by AGIS in processing steel inputs into CORE represented only a "small" proportion of the value of the CORE imported into the United States. Defendant fails in its response brief to provide any reasonable basis for, or clarification of, Commerce's determination. Instead, Defendant recites Commerce's "findings" that:

- The "nature of the production process to complete CORE in the UAE is minor and AGIS did not add significant processing value to the substrate input in AGIS's production of CORE." Def. Resp. Br. 32.

Plaintiff's Reply Brief
Consol. Court No. 20-00142

*Public Version*

- The "value added by the materials, labor, energy, overhead and other items consumed by AGIS in the production of CORE represents an insignificant value when compared to the value of the merchandise sold to the United States." Def. Resp. Br. 32.

- After evaluating the results of its calculation, Commerce determined that the value added by AGIS comprises only a small proportion of the total export value. Def. Resp. Br. 33.

- The "value added by AGIS in the UAE comprises a small proportion of the total value of the merchandise imported into the United States." Def. Resp. Br. 33.

- The "value added by the processing performed in the UAE is a small proportion of the total value of the merchandise imported into the United States." Def. Resp. Br. 34.

But Commerce never explained any of these "findings." Commerce never demonstrated why

AGIS's nature of production was "minor," why the processing was "insignificant," why the

value added was "small," or what any of these descriptors mean in this specific circumvention

context. In short, Defendant has simply repeated Commerce's conclusory remarks without

providing any basis for how the facts of this case might support such conclusions. Defendant

emphasizes that Commerce should not be held to a specific numerical test in considering the

value added in third-country processing. Def. Resp. Br. 31-32 (citations omitted). But the

absence of numerical standards does not relieve Commerce of the requirement to provide support

for its decisions. Conclusions are not substantial evidence. In order for the Court to affirm

Commerce's determination, the agency must have provided "a reasoned explanation ... that is

supported by the administrative record." Dorbest v. United States, 30 C.I.T. 1671, 1677-78, 462

F. Supp. 2d 1262, 1269-70 (2006) (citing Goldlink Indus. Co. v. United States, 30 C.I.T. 616,

629, 431 F. Supp. 2d. 1323, 1334 (2006)).

Defendant-Intervenor does not respond to Plaintiff's value-added arguments, but does

remark on the importance of Commerce using "reference points" to measure the statutory

Plaintiff's Reply Brief
Consol. Court No. 20-00142

*Public Version*

circumvention factors. *See* SDI Resp. Br. 8. But Commerce here did not rely on any reference points at all. Commerce simply asserted that AGIS's [                    ] value added of processing HRS and CRS into CORE was "small," without providing any basis or context for why such percentages should be considered "minor" or "insignificant." Def. Resp. Br. 33.[3] Because Commerce provided no explanation, Defendant's response, as shown by the quotations above, necessarily is limited to repeating the same assertions over and over to make they appear self-evident. Without any reference points or explanation, Commerce could have reached the opposite conclusions that "AGIS added *significant* processing value to the substrate input in AGIS's production of CORE" or that the "value added by AGIS in the UAE comprises a *large* proportion of the total value of the merchandise imported into the United States." Such conclusions, however, would have been no more explanatory and no more correct.

Defendant claims that Commerce supported its value added conclusions by reference to prior CORE circumvention determinations that "lend additional support for the agency's finding that the value added is relatively insignificant." Def. Resp. Br. 34, citing IDM at 21 (citations omitted). But these cases – covering different countries with different HRS and CRS costs – have little relevance to AGIS's production costs in the UAE and have no relevance to the value of in-scope merchandise that AGIS shipped to the United States. As such, these other cases provide no support for whether the value of AGIS's processing in the UAE represents a small or large proportion of the value of the merchandise imported into the United States. *See* 19 U.S.C.

---

[3] Defendant concedes that errors in Commerce's initial calculations increased these percentages from the [                    ] calculated in Commerce's preliminary determination, but claims that *the percentage of value added does not materially change*." Def. Resp. Br. 33 (emphasis in original). Neither Commerce nor Defendant offers any explanation of why [                    ] changes in the percentages of value added should not be considered "material changes."

Plaintiff's Reply Brief
Consol. Court No. 20-00142

*Public Version*

§ 1677j(B)(1)(C). Defendant's citation to MEPS International's carbon steel price data provides only an empty comparison because the data similarly have no bearing as to whether the value added of AGIS's processing in the UAE is "large" or "small" or constituted a significant proportion of the value of CORE imported into the United States. *See* Def. Resp. Br. 34-35. Commerce thus failed to support its conclusions with a reasoned analysis.

Defendant also has no answer to the record evidence presented by Plaintiff that the value added processing Chinese HRS and CRS into CORE in the UAE for *the sales actually made to the United States* for the period examined by Commerce were [     ] percent [     ] percent, respectively. *See* AGIS's Case Brief, "Anti-Circumvention Inquiries Involving the UAE of the Antidumping and Countervailing Duty Orders on Certain Corrosion-Resistant Steel Products from the People's Republic of China – UAE Segment (April 6, 2020), at Attachment 1, CR 83, 84. Defendant does not address these value-added percentages (which ranged as high as [     ] percent on some individual U.S. sales) at all. Defendant's silence no doubt reflects a reluctance to admit that the lower value-added percentages that Commerce calculated were not based on the actual profits of U.S. sales of subject merchandise, and instead were based on the company-wide profitability of AGIS as a whole. *See* AGIS Br. 30. Defendant offers no explanation of how the value-added percentages calculated by Commerce represent the actual added value of sales of in-scope merchandise to the United States when Commerce did not use in its calculations the actual profit earned on U.S. sales. When the statute requires Commerce to determine whether "the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States," 19 U.S.C. §1677j(b)(2)(E), it was legally incorrect for Commerce to include in its value-added calculations the profits from sales of non-scope merchandise. Furthermore, Commerce's approach in this case also was

Plaintiff's Reply Brief
Consol. Court No. 20-00142

*Public Version*

mathematically unreasonable. In 2017, which was the most recent annual period where AGIS had sales of CORE to the United States that were produced with Chinese HRS or CRS substrate, AGIS sold [                    ] of in-scope merchandise to the United States with a value of [          ]. During the same period, AGIS had [                    ] of sales of CORE to the United States with a value of [              ] and worldwide sales of CORE of [                    ] with a value of [                ]. In other words, AGIS's U.S. sales of CORE produced with Chinese substrate represented only [                ] of U.S. sales and [              ] of worldwide sales by volume and [                ] of U.S. sales and [                ] of worldwide sales by value. Given the circumstances, it was not reasonable for Commerce to assign AGIS's *overall* company-wide profit percentage to the miniscule portion of in-scope merchandise that AGIS sold to the United States, especially when such sales represented [                        ] of AGIS's U.S. sales of CORE and [                        ] of AGIS's worldwide sales of CORE.

While the statute "does not require the use of AGIS's preferred formula," Def. Resp. Br. 35, the law does require Commerce's approach to be reasonable and in accordance with law. Here, Commerce's approach was neither. Contrary to Defendant's claim, Commerce provided no explanation for basing the profit portion of value added on AGIS's [        ] worldwide profits than on the [        ] profits actually earned on its sales of in-scope merchandise imported into the United States. *See id.*, *citing* IDM at 20-22. It is well-settled that for agency action to be based on substantial evidence, the agency must explain why evidence that fairly detracts from the reasonableness of its determination is not outweighed by evidence that supports Commerce's determination. *See, e.g.*, *Universal Camera v. NLRB*, 340 U.S. 474, 488 (1951). Defendant addresses none of the record evidence highlighted by AGIS that detracts from the reasonableness of Commerce's decision (e.g., the [        ] percentages of value added processing proffered by

Plaintiff's Reply Brief
Consol. Court No. 20-00142

*Public Version*

AGIS and the legal and mathematical concerns with using AGIS's worldwide profits to determine value added). Given the errors in Commerce's analysis as to whether AGIS's production of CORE made with Chinese substrate was minor or insignificant under section 19 U.S.C. § 1677j(b)(1)(C) of the Act, Commerce's decision was unreasonable and unsupported by substantial evidence.

### C. Defendant Fails to Show How Commerce's Valuation of Chinese HRS and CRS Substrate Using Surrogate Values Was in Accordance with Law

Defendant and Defendant-Intervenor fail to provide a reasonable explanation for Commerce's use of surrogate costs from Malaysia to value the HRS and CRS material inputs that AGIS sourced from China in determining whether "the value of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the total value of the merchandise exported to the United States." 19 U.S.C. § 1677j(b)(1)(D). Defendant claims that "non-market economy costs and prices are inherently unreliable," Def. Resp. Br. 40, and Defendant-Intervenor explains that "an NME does not operate on market principles of cost or pricing structure." SDI Resp. Br. 9. Both Defendant and Defendant-Intervenor thus claim that Commerce was correct not to rely on the actual prices of HRS and CRS sold to AGIS in the UAE, a market-economy country. Def. Resp. Br. 40; SDI Resp. Br. 9. But in comparing the level of investment for CORE production in the UAE to the level of investment in China of producers of HRS and CRS inputs under 19 U.S.C. § 1677j(b)(1)(C), Commerce relied heavily on its conclusions that "the average expenditure for construction of integrated steel mills in China was $3.6 billion, with projects ranging from $295 million to $10.12 billion." Def. Resp. Br. 20, citing IDM at 17. And Defendant and Defendant-Intervenor perceive no inconsistency with such reliance, and strongly support Commerce's use of the non-market economy costs to build integrated steel mills in China when comparing such costs to the

Plaintiff's Reply Brief
Consol. Court No. 20-00142

*Public Version*

investment AGIS made in its CORE production facility in the UAE. *See* Def. Resp. Br. 19-21;

SDI Resp. Br. 7-8. When Commerce determines that the sales prices to market-economy

purchasers *outside* of China are unreliable, but the costs to construct integrated steel production

facilities *in* China are reliable, Commerce is making arbitrary determinations that are

unsupported by substantial evidence. Defendant and Defendant-Intervenor provide no

explanation to resolve this contradiction.

Case law also does not support Commerce's use of surrogate values in this case. AGIS

recognizes that the Court in *U.K. Carbon and Graphite Co., Ltd. v. United States*, 931 F. Supp.

2d 1322, 1336 (Ct. Int'l Trade 2013) ("*U.K. Carbon and Graphite*"), disagreed with AGIS's

interpretation of the statute, but *U.K. Carbon and Graphite* is not binding on the Court here. *See*

*Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989). More important, the

holding in *U.K. Carbon and Graphite* is not persuasive because the Court was concerned, at least

in part, with factors that are not present here. Specifically, in *U.K. Carbon and Graphite*,

Commerce had found that "the actual prices that {the third-country producer} paid for its

Chinese-sourced artificial graphite rods are inherently unreliable." 931 F. Supp 2d at 1336. In

contrast, Commerce in this case indicated that "NME costs and prices are inherently unreliable,"

IDM at 21, but made no similar specific determination that *the prices that AGIS paid* to its

Chinese suppliers for HRS and CRS inputs were "unreliable," and Defendant and Defendant-

Intervenor do not contest this fact. *See* Def. Resp. Br. 38; *compare* SDI Resp. Br. 9 ("sales *in*

NME countries do not reflect the fair value of the merchandise"). Furthermore, it is axiomatic

that Commerce found in this case that the HRS and CRS purchase prices that AGIS paid to its

suppliers *were* reliable because Commerce actually used those prices in its value-added

calculations under 19 U.S.C. § 1677j(b)(1)(C) to determine AGIS's costs to process Chinese

HRS and CRS into CORE in the UAE. *AGIS Final Analysis*, at 2-4 and Attachment 1, CR 88,

89. Moreover, Commerce verified that the Chinese HRS and CRS purchase prices it used to

calculate the value-added costs were complete and accurate:

> AGIS reported cold and hot-rolled costs and by-product offsets of sales and cost of
> manufacturing to the United States containing Chinese substrate based on *the actual
> cold and hot-rolled costs* of the inputs used to make the CORE shipped to the
> United States. Commerce officials traced *the actual purchases* of the cold and hot-
> rolled steel coil substrate to the purchases recorded in the invoices and recorded in
> the purchase ledgers and then recalculated the per MT cost reported to Commerce.

*Verification Report of the Questionnaire Responses of Al Ghurair Iron & Steel LLC in the Anti-*

*Circumvention Inquiries of the Antidumping and Countervailing Duty Orders on Corrosion-*

*Resistant Steel From the United Arab Emirates* (March 24, 2020), at 19, CR 81 (emphasis

added). When Commerce found AGIS's HRS and CRS purchase prices to be reliable for

calculating costs under 19 U.S.C. § 1677j(b)(1)(C), it was not reasonable for Commerce to

conclude that *the exact same purchase prices* were unreliable under 19 U.S.C. § 1677j(b)(1)(D).

As a result, Commerce's use of surrogate values to determine whether the value of the HRS and

CRS inputs was a significant portion of the total value of the merchandise exported to the United

States was unsupported by substantial evidence and otherwise contrary to law.

### D.     Defendant Fails to Defend That Commerce's Reliance on Only a Single Pattern of Trade Was Reasonable

Defendant and Defendant-Intervenor misconstrue Plaintiff's arguments with respect to

whether Commerce appropriately considered patterns of trade in determining whether the CORE

produced by AGIS in the UAE using HRS and CRS substrate from China should be included

within the scope of the *China CORE Orders*. Defendant claims that "AGIS alleges that

Commerce has arbitrarily cherry-picked the particular time periods examined for {the} pattern of

trade factors." Def. Resp. Br. 42. This is false. As explained in Plaintiff's Rule 56.2 brief,

AGIS clearly understood Commerce's rationale for using June 2015 – the month in which

Commerce initiated the original AD and CVD investigations of CORE from China – "as a

bifurcating date to compare 49-month periods preceding and following the initiation of the

investigations that led to the *China CORE Orders*." AGIS Br. 34. The period selected for

examination was not arbitrary. What was arbitrary was Commerce's limitation of its comparison

of changes in pattern of trade *solely* to the pre- and post-initiation period without considering

additional alternate periods of time that were more probative of AGIS's overall trade behavior

and that demonstrated that AGIS's production and shipping patterns did not shift in response to

the *China CORE Orders*.

Defendant-Intervenor asserts that AGIS demands that Commerce "must pick and choose

data from certain time periods based on instructions from Plaintiff." SDI Resp. Br. 11. Clearly,

this is not Plaintiff's position. Rather, AGIS has argued that Commerce should not have ignored

alternate data and alternate time periods brought to its attention by AGIS, which showed

different patterns of trade. AGIS Br. 34-37. This, Commerce failed to do.

In the circumvention inquiry, AGIS identified numerous patterns of trade that

contradicted Commerce's conclusion. In response to AGIS's argument that it annually

decreased its shipments of CORE containing Chinese substrate to the United States following the

publication of the *China CORE Orders*, Commerce did not address this pattern at all, and stated

only that "AGIS did ship CORE containing Chinese substrate to the United States after the

*China CORE Orders*." IDM at 13. That AGIS shipped some CORE merchandise containing

Chinese substrate to the United States following the *China CORE Orders* is not a "pattern,"

however. Nor did Commerce address the pattern – shown in the chart below – that AGIS

stopped shipping CORE with Chinese substrate to the United States nearly two years before the

Plaintiff's Reply Brief
Consol. Court No. 20-00142

*Public Version*

August 12, 2019, initiation of the circumvention inquiry, and that by the time of the final

circumvention determination, AGIS had not shipped any in-scope merchandise to the United

States for almost three years. AGIS Br. 35, citing AGIS IQR, at Exhibits 7 and 32(b), CR 8-28.

[


]

Nor did Commerce consider that during the same period that AGIS decreased and then

stopped shipping to the United States CORE that was produced with Chinese HRS or CRS

substrate, AGIS simultaneously increased its U.S. shipments to the United States of CORE

produced with non-Chinese substrate. *Id.* Nor did Commerce consider that since June 2011,

Chinese-origin HRS and CRS purchases represented [        ] of the total steel substrate

purchased worldwide by AGIS or that AGIS's semi-annual steel purchases from China declined

since the issuance of the *China CORE Orders* both in absolute terms and also in terms of the

percentage of the company's overall steel substrate purchases. AGIS IQR, at Exhibits 34 and 37,

CR 8-28. In particular, Commerce did not address that AGIS's semi-annual steel purchases from

China decreased from [


] of all HRS and CRS purchases in the final semi-annual period

examined by Commerce. *Id.* Altogether, Commerce ignored substantial record information that

**Plaintiff's Reply Brief**
**Consol. Court No. 20-00142**

*Public Version*

significantly detracted from its decision that patterns of trade supported a determination to

include CORE produced by AGIS in the UAE with Chinese HRS and CRS substrate within the

*China CORE Orders*. It was not reasonable for Commerce to have relied on only a single pattern

of trade that was contradicted and overshadowed by multiple other patterns. Because Commerce

neither weighed the significance of the patterns of trade outlined by AGIS nor found AGIS's

trade data unreliable, Commerce's pattern of trade decision was arbitrary, and the Court should

remand this issue to Commerce for further consideration.

## III.   **CONCLUSION**

For the reasons set forth above, we respectfully request that the Court grant AGIS's

motion for judgment on the agency record and remand this case to Commerce with instructions

to revise the *Final Determination* in a manner consistent with the arguments set forth above and

in AGIS's Rule 56.2 Memorandum.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink
Jonathan M. Freed

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
Tel.:  (202) 223-3760

Dated:  May 28, 2021                    *Counsel to Plaintiff Al Ghurair Iron & Steel LLC*

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| AL GHURAIR IRON & STEEL LLC,<br><br>                Plaintiff,<br><br>     v.<br><br>UNITED STATES,<br><br>                Defendant,<br><br>     and<br><br>UNITED STATES STEEL CORPORATION,<br>NUCOR CORPORATION, and<br>STEEL DYNAMICS, INC.,<br><br>                Defendant-Intervenors. | Court No. 20-00142 |

## CERTIFICATE OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)

The undersigned counsel at Trade Pacific PLLC hereby certifies that the accompanying Reply Brief, dated May 28, 2021, complies with the maximum 7,000 word-count limitation described in part 2(B)(1)(a) of the Court's Chambers Procedures. The memorandum of law contains 6,035 words according to the word-count function of the word-processing software used to prepare the memorandum, excluding the table of contents, table of authorities, and counsel's signature block.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink
Jonathan M. Freed
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C. 20003
Tel.: (202) 223-3760

Dated: May 28, 2021                    *Counsel to Plaintiff Al Ghurair Iron & Steel LLC*