Slip Op. 21-129

## UNITED STATES COURT OF INTERNATIONAL TRADE

**AL GHURAIR IRON & STEEL LLC**,

　　　　Plaintiff,

　　v.

**UNITED STATES**,

　　　　　Defendant,

　　and

**UNITED STATES STEEL
CORPORATION,
NUCOR CORPORATION, and
STEEL DYNAMICS, INC.**,

　　　　Defendant-Intervenors.

**Before: Timothy M. Reif, Judge**

**Court No. 20-00142
PUBLIC VERSION**

## <u>OPINION</u>

[Denying plaintiff's motion for judgment upon the agency record pursuant to USCIT Rule 56.2 and sustaining Final Determination.]

Dated: September 24, 2021

<u>Robert G. Gosselink</u>, Trade Pacific PLLC, of Washington, D.C., argued for plaintiff. With him on the brief was <u>Jonathan M. Freed</u>.

<u>Mollie L. Finnan</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. With her on the brief were <u>Brian M. Boynton</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Claudia Burke</u>, Assistant Director. Of counsel on the brief was <u>Elio Gonzalez</u>, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

**PUBLIC VERSION**

Court No. 20-00142                                                                            Page 2

Benjamin J. Bay, Schagrin Associates, of Washington, D.C., argued for defendant-intervenors.  With him on the brief were Roger B. Schagrin and Luke A. Meisner.

* * *

Reif, Judge:  This action arises from a challenge by plaintiff, Al Ghurair Iron & Steel LLC ("AGIS") to certain aspects of the final results of the U.S. Department of Commerce's ("Commerce") final determination of circumvention of the antidumping duty and countervailing duty orders on corrosion-resistant steel products ("CORE") from the People's Republic of China ("China").  *See Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Final Determination of Circumvention Involving the United Arab Emirates*, 85 Fed. Reg. 41,957 (Dep't of Commerce July 13, 2020) ("Final Determination") and accompanying Issues and Decision Mem. ("IDM").

Plaintiff filed a motion for judgment upon the agency record pursuant to U.S. Court of International Trade ("USCIT") Rule 56.2 and asserts four principal claims related to Commerce's Final Determination: (1) substantial evidence does not support that AGIS' levels of investment and production facilities are minor or insignificant; (2) substantial evidence does not support Commerce's determination that the value of processing in the United Arab Emirates ("UAE") represents only a small proportion of the value of the merchandise imported into the United States; (3) Commerce's valuation of Chinese cold-rolled steel ("CRS") and hot-rolled steel ("HRS") substrates using Malaysian surrogate values was contrary to law; and, (4) Commerce ignored patterns of trade that confirm that AGIS was not circumventing the *2016 CORE Orders*.  *See Certain Corrosion-Resistant Steel Products from India, Italy, the People's Republic of*

*China, the Republic of Korea and Taiwan: Amended Final Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders*, 81 Fed. Reg. 48,390 (Dep't of Commerce July 25, 2016); *see also Certain Corrosion-Resistant Steel Products from India, Italy, Republic of Korea and the People's Republic of China: Countervailing Duty Order*, 81 Fed. Reg. 48,387 (Dep't of Commerce July 25, 2016) (collectively, "*2016 CORE Orders*"); Mem. Supp. Rule 56.2 Mot. Pl., AGIS, for J. upon Agency R. ("Pl. Br.") at 17-38, ECF Nos. 34, 36; Reply Br. Pl. AGIS ("Pl. Reply Br."), ECF Nos. 48, 49.  Defendant United States and defendant-intervenors, United States Steel Corporation, Nucor Corporation and Steel Dynamics, Inc. (collectively, "defendant-intervenors") respond that Commerce's determination is supported by substantial evidence and is otherwise in accordance with law.  *See* Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. on Agency R. ("Def. Br."), ECF Nos. 42, 43; *see also* Steel Dynamics, Inc.'s Resp. Br. Opp'n to Pl.'s Mot. for J. on Agency R. ("Def.-Intervenor Br."), ECF No. 44.

For the reasons discussed below, the court sustains Commerce's Final Determination.

## BACKGROUND

Commerce issued the *2016 CORE Orders* on July 25, 2016.  To prevent evasion of the *2016 CORE Orders*, Commerce initiated several circumvention inquiries with respect to imports from or activities in third countries — among them, the UAE — in August 2019.   Preliminary Decision Mem., A-570-026 (Dep't of Commerce Feb. 7, 2020) ("PDM") at 1.  Like Commerce's other circumvention investigations, Commerce

**PUBLIC VERSION**

conducted this inquiry on a country-wide basis.  IDM at 11-12.  Imports of CRS and

HRS substrates from China into the UAE increased following the initiation of the 2016

CORE investigations.  *Id.* at 9.  Consequently, Commerce commenced an investigation

into whether plaintiff, as a CORE manufacturer located in the UAE, was circumventing

the *2016 CORE Orders*.

        In its Final Determination*,* Commerce reaffirmed its Preliminary Determination

from February 18, 2020 ("Preliminary Determination"), that CORE completed in the UAE

from HRS and CRS manufactured in China were circumventing the antidumping duty

("AD") and countervailing duty ("CVD") orders on CORE from China.  IDM at 1.

Commerce determined preliminarily that action was appropriate to prevent evasion of

the *2016 CORE Orders* pursuant to 19 U.S.C. § 1677j(b)(1)(E).  PDM at 25.  The U.S.

International Trade Commission ("Commission") was notified of Commerce's

preliminary determination of circumvention on February 11, 2020, and the Commission

did not request consultations with Commerce.  Between February 24 and March 4,

2020, Commerce conducted verification in the UAE.  IDM at 2.  Commerce published its

Final Determination on July 13, 2020.  The only difference between Commerce's

Preliminary Determination and Final Determination was the selection and calculation of

the surrogate value used for the Chinese inputs.  *Id.* at 5.  Commerce also addressed

comments on its Preliminary Determination related to non-market economy ("NME")

methodology and other issues in its IDM on July 6, 2020.  *Id.* at 20-25.

PUBLIC VERSION

I.      **Preliminary Determination**

On February 7, 2020, Commerce issued its PDM.  Commerce determined

preliminarily that imports into the United States of CORE, completed in the UAE from

HRS and/or CRS products sourced from China, were circumventing the AD and CVD

orders on CORE from China.  PDM at 1.

A.      **Level of investment, production process and production facilities**

Commerce compared the UAE producers' investment in the CRS mill and CORE

factory in the UAE to a Chinese company's investment in integrated mills in China.  *Id.*

at 15.  Commerce determined that the initial investment of approximately $272 million

for facilities in the UAE was minor compared to the average investment of $3.6 billion

for construction of integrated steel mills in China.  *Id.*  Commerce noted its previous

comparative analyses that culminated in the determination that the production process

and facilities in a third country were insignificant.  *Id.* at 18-20.  These determinations, in

conjunction with information provided by AGIS, led Commerce to find preliminarily that

the nature of the production process and extent of production facilities in the UAE were

insignificant compared to those in China.  *Id.* at 20.

B.      **Value of processing in the UAE**

Commerce found preliminarily that the value of the processing performed by

AGIS in the UAE represented a small proportion of the value of the CORE exported to

the United States under 19 U.S.C. § 1677j(b)(1)(C).  *Id.* at 22.  To evaluate the value

added by AGIS, Commerce compared AGIS' metric ton ("$/MT") further processing

**PUBLIC VERSION**

costs to AGIS' $/MT U.S. sales price.  Preliminary Analysis Mem. (Feb. 7, 2020)

("PAM") at 4-5, CR 47.  Commerce found that the value-added percentage of

processing HRS and CRS substrates into CORE was [[ ]]% and [[ ]]%, respectively.  *Id.*

Based on these percentages, Commerce determined that the value added by AGIS

represented a small proportion of the total export value.  PDM at 21-22.

### C.    Use of surrogate values

Commerce determined that use of surrogate values was appropriate in this

circumvention proceeding because it was initiated under the *2016 CORE Orders*, which

are NME proceedings.  *Id.* at 8.  Commerce's methodology presumes that NME costs

and prices are inherently unreliable.  Accordingly, Commerce chose to use surrogate

values under section 781(b)(1)(D) of the Tariff Act of 1930, as amended, 19 U.S.C. §

1677j(b)(1)(D),[1] to calculate the value of the Chinese substrates.  *Id.*  In accordance

with section 1677b(c)(4), Commerce selected Malaysia as the surrogate country for

China because Malaysia has a similar level of economic development to that of China

and is a significant producer of comparable merchandise.  *Id.* at 8-9.

### D.    Patterns of trade

Commerce considered changes in the pattern of trade by comparing data from

two 49-month periods — the 49-month period prior to initiation of the circumvention

inquiries with regard to the AD and CVD orders on CORE from China (June 2011

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of
Title 19 of the U.S. Code, 2018 edition.

**PUBLIC VERSION**

through June 2015) and the 49-month period after initiation (July 2015 through July 2019).  *Id.* at 23-24.  Commerce examined the average monthly volume of imports of CRS and HRS into the UAE from China and found that imports of CRS and HRS increased by 47.01% and 35.01%, respectively, after the initiation of the CORE investigation.  *Id.*  Additionally, Commerce examined the average monthly volume of exports of CORE from the UAE to the United States and found that exports increased by 5,752.06% during the same period.  *Id.* at 24.  Commerce determined that these data supported an affirmative finding of circumvention.  *Id.*

II.    **Final Determination**

On July 13, 2020, Commerce issued its Final Determination.  In its Final Determination, Commerce found that, consistent with its Preliminary Determination, the CORE at issue were circumventing the AD and CVD orders on CORE from China.  IDM at 1.

A.    **Level of investment, production process and production facilities**

Commerce reaffirmed its preliminary finding that the level of investment required to complete CORE production in the UAE was minor compared to the level of investment required to produce the steel inputs in China.  IDM at 17.  Commerce noted "magnitudes of difference[]" between the two levels of investment.  *Id.*

Commerce reaffirmed also its preliminary finding that the production process and production facilities in the UAE were minor compared to those in China.  *Id.* at 18.  The production stages required for the steel input in China were more numerous, more

**PUBLIC VERSION**

technologically complex and required substantially more investment than the production

stages undertaken by the UAE company.  *Id.*

### B.    Value of processing in the UAE

In its Final Determination, Commerce continued to find that the value of the

processing performed by AGIS in the UAE represented a small proportion of the value

of CORE exported to the United States.  *Id.* at 8.  In consideration of AGIS' argument,

Commerce included profit, financial expenses and selling, general and administrative

("SG&A") costs in its calculation of AGIS' further processing costs and found that the

value-added percentage of processing HRS and CRS substrates into CORE was [[ ]]%

and [[ ]]%, respectively.  Final Analysis Mem. (July 6, 2020) ("FAM") at 2-4, CR 88, 89.

Based on these new value-added percentages, adjusted to reflect AGIS' requests,

Commerce determined that the value-added percentage remained small.  IDM at 20.

### C.    Use of surrogate values

Commerce upheld its previous use of surrogate values.  *Id.* at 21.  Commerce

claimed that this use was justified because the inquiry was initiated under the *2016*

*CORE Orders*, which were NME proceedings.  Since Commerce claimed that NME

costs and prices were inherently unreliable, Commerce chose an NME methodology

and used surrogate values.  *Id.*  Commerce reaffirmed also that it chose a surrogate

country at a comparable level of economic development to China and with significant

producers of comparable merchandise.  *Id.*

PUBLIC VERSION

### D.    Patterns of trade

Commerce continued to find that the comparison of the pattern of trade from the 49-month period before the initiation of the *2016 CORE Orders* with the 49-month period after the initiation supported a finding of circumvention.  *Id.* at 8.  Commerce examined also AGIS' import and export data during the same time periods and found an increase in AGIS' sourcing of Chinese-origin substrates and an increase in AGIS' exports of CORE to the United States.  *Id.* at 12 (citing PAM at 8).  Specifically, Commerce found that AGIS' purchase of CRS and HRS substrates from China increased by [[ ]]% in the 49-month period after the initiation of the CORE investigation.  PAM at 7.  Additionally, AGIS' export of CORE using Chinese-origin substrate to the United States increased from [[ ]] metric tons to [[ ]] metric tons after the initiation of the 2016 CORE investigations.  *Id.* at 8.  In addition to country-wide patterns of trade, Commerce found that these AGIS-specific patterns of trade supported a finding of circumvention.  IDM at 12.

## STANDARD OF REVIEW

This court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(vi) and 28 U.S.C. § 1581(c).  Under 19 U.S.C. § 1516a(b)(1)(B)(i), the court is required to hold unlawful Commerce's determination if it is found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  This standard is

deferential, with a high barrier to reversal.  *Nippon Steel Corp. v. United States*, 458

F.3d 1345, 1351-52 (Fed. Cir. 2006) (citation omitted).  The question for the court is "not

whether we agree with [Commerce's] decision, nor whether we would have reached the

same result as [Commerce] had the matter come before us for decision in the first

instance," but whether Commerce's determination was "reasonable and supported by

the record as a whole . . . ."  *Id.* at 1352 (first quoting *U.S. Steel Grp. v. United States*,

96 F.3d 1352, 1357 (Fed. Cir. 1996); then quoting *Altx, Inc. v. United States*, 370 F.3d

1108, 1121 (Fed. Cir. 2004) (internal quotation marks omitted)).

　　　The court must review the record in its entirety, "including whatever fairly detracts

from the substantiality of the evidence."  *Atl. Sugar, Ltd. v. United States*, 744 F.2d

1556, 1562 (Fed. Cir. 1984).  Still, the possibility of drawing two inconsistent

conclusions from the record "does not prevent an administrative agency's finding from

being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607,

620 (1966) (citation omitted).  Under the substantial evidence standard, the court should

uphold the agency determination as long as "its factual findings are reasonable and

supported by the record as a whole, even if there is some evidence that detracts from

the agency's conclusion."  *Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834,

159 F. Supp. 2d 714, 718 (2001), *aff'd sub nom. Shandong Huarong Gen. Grp. Corp. v.*

*United States*, 60 F. App'x 797 (Fed. Cir. 2003).

## LEGAL FRAMEWORK

　　　Circumvention inquiries are governed by 19 U.S.C. § 1677j.  When the process

of assembly or completion of merchandise occurs in a third country other than the

country named in the AD or CVD order, the relevant provision is 19 U.S.C. § 1677j(b).

To find that imported merchandise completed in a third country falls within the scope of

the AD/CVD order, Commerce must show that the merchandise meets all the criteria

under section 1677j(b)(1).  Germane to this case are sections 1677j(b)(1)(C) ("the

process of assembly or completion in the foreign country referred to in subparagraph

(B) is minor or insignificant") and 1677j(b)(1)(D) ("the value of the merchandise

produced in the foreign country to which the antidumping duty order applies is a

significant portion of the total value of the merchandise exported to the United States").

To include imported merchandise completed or assembled in a third country

other than the country named in the AD/CVD order, Commerce must determine that the

process of assembly or completion in the foreign country is "minor or insignificant."  19

U.S.C. § 1677j(b)(1)(C).  In determining whether the process of assembly or completion

is minor or insignificant, the statute directs Commerce to take into account five factors:

(1) the level of investment in the foreign country; (2) the level of research and

development in the foreign country; (3) the nature of the production process in the

foreign country; (4) the extent of production facilities in the foreign country; and, (5)

whether the value of processing performed in the foreign country represents a small

proportion of the value of the merchandise imported into the United States.  19 U.S.C. §

1677j(b)(2).  No single factor under section 1677j(b)(2) controls.  19 C.F.R. §

351.225(h).

Court No. 20-00142                                                                    Page 12

Under section 1677j(b)(3), Commerce is required to take into account the

following additional factors when making its determination: (1) the pattern of trade,

including sourcing patterns; (2) whether the manufacturer or exporter of the

merchandise is affiliated with the person who uses the merchandise to assemble or

complete in the foreign country the merchandise that is subsequently imported into the

United States; and, (3) whether imports into the foreign country of the merchandise

have increased after the initiation of the investigation which resulted in the issuance of

such order or finding.

## DISCUSSION

I.   **Whether substantial evidence supports that AGIS' level of investment in the
     United Arab Emirates (UAE) and the nature of the production process and
     the extent of production facilities there are minor or insignificant**

   A.   **Positions of the parties**

       1.   **Commerce's comparison of the levels of investment in the
            UAE as compared to levels in China**

Plaintiff argues that its level of investment in the UAE is significant under the

statute.  For example, plaintiff lists AGIS' initial monetary investment as United Arab

Emirates Dirham (AED) [[ ]] in 2008, plus a shareholders' loan of AED [[ ]] and project

term loan of AED [[ ]] from HSBC Bank.  Additional investments amounted to AED [[ ]].

Pl. Br. at 9.  Plaintiff claims that by the end of 2018, AGIS' total assets were valued at

the substantial sum of AED [[ ]] (approximately $[[ ]]).  *Id.* at 10.

Plaintiff contends that the establishment of its CORE operations prior to the

initiation of the investigations that resulted in the *2016 CORE Orders* indicates that

AGIS did not circumvent the orders.  *Id.* at 22-23.  Plaintiff adds that the sequencing of

AGIS' initial investment — specifically, its occurrence prior to the issuance of the *2016*

*CORE Orders* — disproves that AGIS intended to circumvent the order.  *Id.* at 23.

Plaintiff argues that the sequencing of AGIS' investment shows that AGIS' investment

here did not arise as a response or in reaction to the *2016 CORE Orders.  Id.*  Plaintiff

points to the *Statement of Administrative Action Accompanying the Uruguay Round*

*Agreements Act*, H.R. Doc. No. 103-316, vol. 1 (1994) ("SAA"), to show that

circumvention inquiries are meant to cover intentional evasion as evidenced by minor or

insignificant assembly or completion in a third country — unlike, plaintiff maintains,

AGIS' operation in the UAE.  Pl. Br. at 19.  Plaintiff notes that according to the SAA, the

purpose of third-country assembly circumvention inquiries is not to deter legitimate

investment in third countries.  SAA at 224.  Rather, plaintiff argues, the purpose is to

determine whether a producer was incentivized to "move its further processing across

borders *to avoid the discipline of the order*."  Pl. Reply Br. at 9.

Defendant, on the other hand, asserts that plaintiff's level of investment in the

UAE is not significant — the level of investment in the UAE is minor compared to that in

China.  Def. Br. at 18.  Defendant counters also that the congressional record does not

indicate that Congress intended to limit the scope of circumvention inquiries to third-

country operations established after the initiation of the investigation leading to the

issuance of an AD/CVD order.  *Id.* at 24.  Defendant notes similarly that the statute does

not require intent.  *Id.* at 23; 19 U.S.C. § 1677j(b)(1)(E).  Defendant argues that there is

no indication either in the statute or in its legislative history that evasion must be

intentional.  Def. Br. at 23; 19 U.S.C. § 1677j(b)(1)(E); *see also* SAA at 224.  Rather,

defendant maintains that Commerce must only determine that action is appropriate to

prevent evasion.  Def. Br. at 23.

Defendant-intervenor Steel Dynamics, Inc. adds that the creation of such a

restriction would create a "get out of jail free" card by encouraging companies in third

countries to rush to build facilities in anticipation of an AD or CVD investigation.  Def.-

Intervenor Br. at 4.  This argument amounts to the contention that an exporter could

avoid an affirmative determination of circumvention solely through possession or use of

a pre-existing facility.

### 2.    Commerce's comparative analysis of the production process and facilities

Plaintiff argues that both the production process and production facilities in the

UAE are extensive and, therefore, not minor.  Pl. Br. at 21.  In particular, plaintiff

highlights that AGIS' production process in the UAE to convert steel substrates imported

from China into CORE entails at least seven stages.  *Id.* at 2.  Plaintiff details each

stage of the production process in the UAE, including trimming, pickling, cold rolling,

hot-dip galvanizing, coating, slitting and cutting.  *Id.*  Plaintiff notes that Commerce has

also issued separate AD and CVD orders for HRS, CRS and CORE, considering each

discrete merchandise as individually eligible for its own investigation of unfair trade

practices.  *Id.* at 6.  CORE was also deemed sufficiently distinct as to warrant its own

investigation.  *See Certain Corrosion-Resistant Steel Products from Italy, India, the*

*People's Republic of China, the Republic of Korea, and Taiwan: Initiation of Less-Than-*

*Fair Value Investigations*, 80 Fed. Reg. 37,228 (Dep't of Commerce June 30, 2015); *see*

*also Certain Corrosion-Resistant Steel Products from the People's Republic of China:*

*Final Determination of Sales at Less Than Fair Value, and Final Affirmative Critical*

*Circumstances Determination, in Part*, 81 Fed. Reg. 35,316 (Dep't of Commerce June

2, 2016).  From plaintiff's perspective, it follows logically that manufacturing CORE from

hot-rolled or cold-rolled inputs should be considered significant under the statute.  Pl.

Br. at 6.

　　　　With respect to production facilities, plaintiff notes that Commerce's on-site

investigation of facilities confirmed that plaintiff employs hundreds of employees.  *Id.* at

12.  Commerce confirmed that plaintiff's facilities include slitting and pickling lines, a

CRS cold-rolling line and two continuous galvanizing lines capable of producing

500,000 metric tons per year of CORE.  *Id.* (citing AGIS Initial Questionnaire Response,

at Ex. 3, CR 8-28; AGIS Verification Report, at 2, CR 81).  Plaintiff references

Commerce's description of these operations as sophisticated and reliant on skilled labor

and expensive, customized equipment — including conveyor systems, stocking ramps,

vertical assemblies, engines and exhaust systems.  *Id.* at 13 (citing AGIS Initial

Questionnaire Response, at Exs. 3 and 28, CR 8-28; AGIS Verification Report, at 8 and

Ex. 8, CR 70 and 81).

　　　　Plaintiff contrasts its own production in the UAE to the minor production at issue

in *Tissue Paper from the People's Republic of* China.  Pl. Br. at 21-22; *see also Certain*

**PUBLIC VERSION**

*Tissue Paper Products from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 78 Fed. Reg. 14,514 (Dep't of Commerce Mar. 6, 2013); *Certain Tissue Paper Products from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 78 Fed. Reg. 40,101 (Dep't of Commerce July 3, 2013) ("*Tissue Paper Final Determination*") and accompanying Issues and Decision Mem. ("Tissue Paper IDM"). In that case, the production process in a third country, India, consisted of cutting and folding tissue paper. Tissue Paper IDM at 2. The process in India consisted of converting jumbo rolls into cut-to-length tissue paper, and Commerce considered this conversion minor compared to the previous production process that took place in China. *Id.* at 6. Plaintiff here argues that its own production is more significant in this context than cutting and folding was in the earlier case. Pl. Br. at 21-22.

Defendant's determination of whether the production process and production facilities are significant depends ultimately on the same comparative analysis discussed above. Defendant considers the UAE's production process and facilities minor compared to those in China. Def. Br. at 27. For example, defendant argues that the production facilities — specifically the materials, energy, labor and capital equipment — located in the UAE are not substantial relative to those in China required to hot roll and produce the inputs. *Id.* at 29. Defendant maintains that "the vast majority of production activities necessary to produce CORE occur at earlier stages in the CORE production

**PUBLIC VERSION**

process, including at the molten steel, semi-finished steel, and hot-rolling stages."  *Id.* at

28.

> **B.     Analysis**
>
> > **1.      Commerce's comparison of the levels of investment in the UAE as compared to China**

Commerce's conclusion that the investment in the UAE was minor or insignificant

based on a comparative analysis is reasonable for four reasons.  First, the statute does

not outline a specific methodology for Commerce to follow to determine the level of

investment.  19 U.S.C. § 1677j(b)(2)(A).  Second, Commerce's approach aligns with its

past practice.  Third, Commerce has found circumvention regardless of the point in time

at which third-country operations were established.  Fourth, the statute does not provide

for consideration of whether circumvention occurred as a response to the imposition of

AD/CVD duties or the initiation of an investigation.  *See* 19 U.S.C. § 1677j(b)(3)(C).

Based on the absence of a designated methodology, Commerce has the

discretion to decide on its own method of analysis.  *See Timken Co. v. United States*,

38 CIT ___, ___ n.7, 968 F. Supp. 2d 1279, 1286 n.7 (2014), *aff'd*, 589 F. App'x 995

(Fed. Cir. 2015) (when a statute "places no other limits on the methodologies that

Commerce may employ . . . , [it] leav[es] Commerce discretion as to the choice of

methodologies").  The statute does not provide for a specific minimum or maximum

level of investment to qualify as minor or insignificant, so Commerce has the discretion

to adapt to different factual circumstances to address circumvention.  19 U.S.C. §

1677j(b)(2)(A).

**PUBLIC VERSION**

Here, Commerce employed an analysis that compared the levels of investment by UAE producers in the CRS mill and CORE factory in the UAE, on the one hand, and a Chinese company's investment in integrated mills in China, on the other.  IDM at 17-20.  A determination of the third country's portion of the total sum of investment is useful to gauge the level of investment is in a third country.  Comparative analysis helps also to ensure that larger companies with much smaller operations in a third country — operations that may appear significant in absolute terms given the size of the firm, but that comprise a small share of total operations — will not be able to elude an AD/CVD order simply on account of the firm's large overall size.  Accordingly, a comparative analysis was reasonable.

The *China/Vietnam CORE Final Determination* noted an average investment of between $295 million and $10.12 billion to construct an integrated steel mill in China, with an average investment of $3.6 billion per steel mill.  IDM at 17; *see also Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Final Determination of the Antidumping Duty and Countervailing Duty Orders,* 83 Fed. Reg. 23,895 (Dep't of Commerce May 23, 2018) ("*China/Vietnam CORE Final Determination*") and accompanying Issues and Decision Mem. ("China/Vietnam CORE IDM") at 39.  AGIS' total assets were approximately $[[ ]], a far smaller amount.  PAM at 2.  Plaintiff contends that the determination was unreasonable because Commerce's comparison of AGIS' investments to the investments in integrated steel mills in China was inapposite.  Pl. Br. at 23.  Plaintiff claims also that the record did not support that

**PUBLIC VERSION**

any of the "integrated steel mills in China" referenced by Commerce actually produced CORE. *Id.* at 24 (citing PAM at 2-3). However, plaintiff does not propose an alternative comparison. Instead, plaintiff states that Commerce should compare investment at each stage of production rather than the overall level of investment. *Id.* Since the statute does not outline a specific methodology for Commerce to determine whether the level of investment is minor or insignificant, 19 U.S.C. § 1677j(b)(2)(A), the court finds that Commerce's methodology here was reasonable.

Second, Commerce's approach was reasonable because it aligns with its past practice. "[I]f Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004). In previous cases involving investment in a third country, Commerce used a similar type of comparative analysis and arrived at similar conclusions. *See Certain Corrosion-Resistant Steel Products from Taiwan: Affirmative Final Determination of Circumvention Inquiry on the Antidumping Duty Order*, 84 Fed. Reg. 70,937 (Dep't of Commerce Dec. 26, 2019) ("*Taiwan/Vietnam CORE Final Determination*") and accompanying Issues and Decision Mem. ("Taiwan/Vietnam CORE IDM"). In the *Taiwan/Vietnam CORE Final Determination*, Commerce determined that the level of investment in steel mills by Taiwanese producers of CORE rendered the level of investment by Vietnamese CORE producers comparatively insignificant. *See* Taiwan/Vietnam CORE IDM at 8, 60-62. In another case, Commerce compared the

**PUBLIC VERSION**

investment required for a Chinese manufacturer to produce an unfinished graphitized electrode to the investment required by the third country to complete production of that product.  *See Small Diameter Graphite Electrodes from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order and Extension of Final Determination*, 77 Fed. Reg. 33,405, 33,412 (Dep't of Commerce June 6, 2012) ("*SDEGs Preliminary Determination*") (unchanged in *Small Diameter Graphite Electrodes from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Orders*, 77 Fed. Reg. 47,596 (Dep't of Commerce Aug. 9, 2012) ) (cited in IDM at 18 n.82).  Further, Commerce compared the investment for a Taiwanese manufacturer to produce polyethylene film tubes to the investment required to complete production of those products in the third country.  *See Polyethylene Retail Carrier Bags from Taiwan: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 79 Fed. Reg. 31,302 (Dep't of Commerce June 2, 2014) ("*PRCBs Preliminary Determination*") and accompanying Preliminary Decision Mem. ("PRCBs PDM") at 9-10 (unchanged in *Polyethylene Retail Carrier Bags from Taiwan: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 79 Fed. Reg. 61,056 (Dep't of Commerce Oct. 9, 2014)) (cited in China/Vietnam CORE IDM at 36 n.115).

In these cases, a comparative analysis — similar to that employed by Commerce here — led Commerce to determine that the level of investment in the third country was comparatively minor.  *See SDEGs Preliminary Determination*, 77 Fed. Reg. at 33,412-

**PUBLIC VERSION**

13 (using a comparative analysis to find that the level of investment in a third country was minor compared to the level in China); *see also PRCBs Preliminary Determination*, 79 Fed. Reg. at 31,302 and accompanying PRCBs PDM at 9-10 (using a comparative analysis to find that the level of investment in a third country was minor compared to the level in Taiwan).

Moreover, Commerce has found circumvention regardless of the point in time at which third-country operations were established, including instances in which the establishment of such operations preceded the issuance of the underlying AD or CVD order. *See Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Affirmative Final Determinations of Circumvention of the Antidumping Duty and Countervailing Duty Orders* ("*Korea CRS Final Determination*"), 84 Fed. Reg. 70,934 (Dep't of Commerce Dec. 26, 2019) and accompanying Issues and Decision Mem. ("Korea CRS IDM") at 57-60. For example, in the Korea CRS IDM, Commerce made clear that "a new facility is not required in order for circumvention to occur" in a case involving HRS produced in Korea and converted to CRS in Vietnam. Korea CRS IDM at 59. For the statute to be read to exclude affirmative findings of circumvention in any circumstance in which there was a pre-existing facility in a third country would create a de facto exception to the statute. The plain text of the statute does not support the creation of such an exception by this court. *See* 19 U.S.C. § 1677j(b)(2)(A).

This conclusion is buttressed by the fact that when Congress intended to incorporate temporal elements in a circumvention inquiry, Congress did so expressly.

**PUBLIC VERSION**

Court No. 20-00142                                                                                       Page 22

*See* 19 U.S.C. § 1677j(b)(3)(C).  Section 1677j(b)(3)(C) provides that Commerce

consider in a circumvention inquiry whether imports from a third country have increased

after the initiation of the investigation that resulted in the issuance of the order.  19

U.S.C. § 1677j(b)(3)(C).  Notably, the statute does not provide for consideration of the

sequencing of establishment of operations relative to an AD/CVD order; the statute

addresses only the timing of actual imports.  19 U.S.C. § 1677j(b)(3)(C).

      Finally, the statute similarly does not provide for consideration of whether

circumvention occurred as a response to the imposition of AD/CVD duties or the

initiation of an investigation.  *See* 19 U.S.C. § 1677j(b)(3)(C).  Commerce addressed

this point directly in its IDM, including by reference to earlier Commerce decisions,

including the *Korea CRS Final Determination*.  *See Korea CRS Final Determination*;

Korea CRS IDM at 57-60.  In that case, Commerce noted that plaintiff cited neither to

legal precedent nor to any other persuasive authority that lays out a requirement for

showing *intent* to circumvent.  *See* Korea CRS IDM at 59.  Similarly, in *Tissue Paper*

*from the People's Republic of China*, Commerce reiterated that "[Commerce] is not

required to determine intent during a circumvention inquiry."  Tissue Paper IDM at 7.

Further, Commerce in the instant case noted that an intent analysis would be "inherently

impractical in the context of trade remedies" due to factors like the difficulty of proving

intent.  IDM at 14.[2]

_____

[2] Commerce explained in its IDM that intent to circumvent is not required by the statute:
"AGIS' argument that Commerce must find intent of evasion in order to reach a finding

Court No. 20-00142                                                                                    Page 23

Accordingly, for the reasons discussed above, Commerce's conclusion that the

investment in the UAE was minor or insignificant based on a comparative analysis was

reasonable.

> **2.    Commerce's comparative analysis of the production process and facilities**

Commerce in its IDM described and discussed in detail the production process at

plaintiff's facilities in China and the production process at its facilities in the UAE and

concluded that the latter was minor and not significant.  *Id.* at 17-20.  Commerce's

comparative approach to the production process and facilities was reasonable and

supported by substantial evidence.

Commerce noted that the production stages in China, such as steel making, slab

casting and hot rolling, are more numerous, more technologically complex and require

substantially more investment than the production stages in the UAE, which were

_____

of circumvention is clearly unsupported by the Act.  The section of the Act identifying the
factors for evaluating whether merchandise completed or assembled in a foreign
country is circumventing an order does not specify that Commerce should consider the
intent of a respondent as part of its analysis.  Rather, section 781(b)(1)(E) of the Act
provides that before issuing an affirmative circumvention determination Commerce
should 'determine{} that action is appropriate . . . to prevent evasion' of the relevant
AD/CVD orders at issue.  Nowhere does the statute indicate that 'evasion' must be
intentional, or that a respondent in the third country must have the 'intent' to evade
duties.  According to AGIS's interpretation of the Act, even if circumvention of an AD or
CVD order exists, Commerce must also — through some undefined means — ascertain
a respondent's intent to evade duties before it may determine that circumvention has
occurred.  Not only is an intent analysis inherently impractical in the context of trade
remedies, there is no support for AGIS's argument in the statute.  Indeed, we have
previously explained that intent is not a necessary element of a finding of
circumvention."  IDM at 13-14 (citations omitted).

**PUBLIC VERSION**

comprised substantially of cutting the steel input, dipping it in hydrochloric acid, rinsing it

with water, drying, cold-rolling and galvanizing.  *Id.* at 18; PAM at 3.  Commerce

determined that the stages in the UAE were minor compared to those required to make

the inputs in China.  IDM at 18.

As with Commerce's comparative approach to investment, Commerce's

comparative approach to determining whether the production process and facilities were

significant or minor was consistent with prior Commerce practice and was reasonable.

For example, in the *China/Vietnam CORE Final Determination*, Commerce compared

the Vietnam facilities' production process — cold-rolling and galvanizing steel

substrates — to the Chinese facilities' production process — creating the HRS and CRS

steel substrates.  *See China/Vietnam CORE Final Determination* and accompanying

China/Vietnam CORE IDM.  Commerce determined that the Vietnam facilities'

production process was minor compared to that of the Chinese facilities.  *See*

China/Vietnam CORE IDM at 40-42.  Commerce's determination in that case that the

substrates produced in China constituted the majority of the production process and that

the third country's production process was comparatively minor is comparable to

Commerce's determination in this case because the production process analysis in that

case is analogous to the production process analysis here.

Plaintiff describes the number of production stages in the UAE and asserts that

they are numerous and complex.  Pl. Br. at 2, 13, 21.  Plaintiff then contrasts those

stages with those addressed by Commerce in its determination in *Tissue Paper from*

**PUBLIC VERSION**

the People's Republic of China.  *See Tissue Paper Final Determination*.  In that case, Commerce found that the allegedly circumventing respondent merely cut jumbo rolls to ordered lengths in the third country.  *See* Tissue Paper IDM at 6-9.

The statute does not direct the court to evaluate the number of stages involved in a production process.  The statute directs the court to consider whether "the nature of the production process" is minor or insignificant.  19 U.S.C. § 1677j(b)(2)(C).  As defendant pointed out, a seemingly "extensive operation" may nonetheless be "minor" in the context of the overall process of manufacturing a product — depending on the nature of that product.  Def. Br. at 30-31.  In that regard, in *Tissue Paper from the People's Republic of China*, the case offered by plaintiff, the respondent broke the production process down into multiple, discrete stages — including, cutting, dying, printing, packaging and packing cut-to-length tissue paper — what plaintiff here characterizes as "cutting jumbo rolls [of toilet paper] into cut-to-length sheets of paper . . . ."  Pl. Br. at 22.  Notwithstanding that the operations in the third country entailed various stages, Commerce, applying the statute, found this process to be minor in the context of the overall production process.  *See* Tissue Paper IDM at 6.

Finally, plaintiff overlooks also that one stage in its UAE production process — cutting completed CORE to particular sheet sizes — is strikingly similar to cutting tissue paper into ordered lengths.  Notably, Congress explicitly referenced cutting steel sheet to customers' ordered lengths in a third country as a situation that qualifies as circumvention.  *See* H.R. Doc. No. 100-33, at 460-61 (1987).  Plaintiff's argument here

**PUBLIC VERSION**

ignores the comparative aspect of a determination of whether the level of investment is

minor or insignificant, or, more specifically, that even if AGIS' production process and

facilities in the UAE appear significant, they are minor as compared to the production

process and facilities in China.

Accordingly, Commerce's comparative approach to determining whether the

production process and facilities were not significant or minor was reasonable.

## II. Commerce's determination that the value of the *processing* performed in the UAE is a small proportion of the value of the *merchandise* imported into the United States

### A. Positions of the parties

Plaintiff argues that Commerce's determination is not supported by substantial

evidence because the determination was based on an incorrect calculation of the value-

added percentages and Commerce inadequately explained its conclusion that the value

of processing performed in the UAE was minor and not significant.  Pl. Br. at 26-31.

Plaintiff argues first that Commerce erred in its calculation of the percentages of value

added by processing in plaintiff's facilities in the UAE.[3]  In particular, plaintiff argues that

---

[3] As discussed above, Commerce found preliminarily that the value-added percentage of processing HRS and CRS substrates into CORE was [[ ]]% and [[ ]]%, respectively. PAM at 4-5.  In consideration of AGIS' argument, Commerce, in its Final Determination added profit, financial expenses and SG&A costs in its revised calculation of AGIS' further processing costs and found that the value-added percentage of processing HRS and CRS substrates into CORE was [[ ]]% and [[ ]]%, respectively.  FAM at 2-4. Commerce did not recognize plaintiff's value-added formula that resulted in different figures, [[ ]]% and [[ ]]%.  IDM at 20; Pl. Br. at 30.  Defendant addresses plaintiff's figure by stating only that "the statute, as Commerce observed, does not require the use of

**PUBLIC VERSION**

Court No. 20-00142                                                                                    Page 27

Commerce added *company-wide* profit, financial expenses and SG&A to the processing

costs instead of adding only *U.S. sale-specific* profit, financial expense and SG&A

information. *Id.* at 28-29. Plaintiff maintains that this approach resulted in an incorrect

calculation because Commerce used profit percentages based on sales of merchandise

to countries other than the United States when calculating the proportion of the value of

merchandise imported into the United States. *Id.* at 30-31. AGIS presented

calculations to Commerce that showed that, had Commerce included profit information

for U.S. sales only, the value of processing Chinese HRS and CRS into CORE in the

UAE would have been [[ ]]% and [[ ]]%, respectively, rather than [[ ]]% and [[ ]]%,

respectively. *Id.* at 30. Not only did Commerce ignore AGIS' calculations, according to

plaintiff, but Commerce also did not provide an explanation for its use of company-wide

profit information rather than U.S. sale-specific profit information. Therefore, plaintiff

argues, Commerce's determination that the value of processing performed in the UAE

was small was based on an incorrect calculation. *Id.* at 30-31.

Second, plaintiff argues that Commerce did not provide a rationale for its

conclusion that the value-added percentages were not significant. *Id.* at 27-28.

Plaintiff's argument amounts to the contention that Commerce erred in its analysis

because of its failure to use a benchmark. *See id.* Plaintiff maintains that Commerce

did not explain what level of processing would qualify as significant, "nor did Commerce

_____

AGIS's preferred formula and Commerce was not otherwise somehow obliged to use it."
Def. Br. at 35.

Court No. 20-00142                                                                Page 28

make any type of comparative analysis as to why these percentages in this particular

proceeding should be considered insignificant." *Id.* at 28.  Plaintiff claims that

Commerce did not clarify the reason that it considered the values still to be small, even

once Commerce's calculations were revised at the request of plaintiff.  *Id.* at 29.

Plaintiff next points to *Peer Bearing Co.–Changshan v. United States*, 39 CIT

___, 128 F. Supp. 3d 1286 (2015).  In that case, Commerce found that when the cost of

manufacturing incurred in the third country accounted for 38% of the total cost of

manufacturing of the product, it was sufficient to support a finding of substantial

transformation.  *Id.* at ___, 128 F. Supp. 3d at 1296.  Plaintiff argues that the

discrepancy between *Peer Bearing* and the present case — in which, according to

plaintiff, the value of processing Chinese HRS and CRS into CORE should have been [[

]]% and [[ ]]%, respectively — supports plaintiff's view that Commerce's determinations

as to the significance of percentages lack both transparency and consistency.  *See* Pl.

Br. at 29-30.

Defendant counters that Commerce's determination that the value of processing

in the UAE represented a small proportion of the value of the merchandise imported into

the United States was reasonable and based on substantial evidence.  Def. Br. at 31-

37.  First, defendant argues that Commerce provided a reasonable and record-based

explanation for the formula that Commerce used to calculate the value-added

percentages.  *Id.* at 35.  Defendant emphasizes that section 1677j(b) does not require

**PUBLIC VERSION**

the use of a specific formula and that Commerce was under no obligation to adopt AGIS' preferred method of calculation.  *Id.*

Second, defendant argues that Commerce provided a reasonable analysis for its conclusion that the value of processing performed in the UAE represented a "small proportion" of the value of the CORE imported into the United States.  *Id.* at 35-37.  In its Preliminary Analysis, Commerce evaluated the value added by AGIS by comparing AGIS' $/MT further processing costs to AGIS' $/MT U.S. sales price.  PAM at 4-5. Defendant argues that in Commerce's Final Determination, Commerce engaged AGIS' argument of adding profit, financial expenses and SG&A into the calculation and explained that "the percentage of value added does not materially change, and thus the cost of processing CRS and HRS would still be much greater than the cost of processing CORE in the UAE."  Def. Br. at 33 (citing IDM at 20).

Defendant maintains further that to buttress Commerce's analysis, Commerce compared prior circumvention determinations in which the value added by processing in Vietnam comprised a small proportion of the value of CORE imported into the United States.  Def. Br. at 34 (citing PDM at 21).  These comparisons supported further the determination that the relative level of processing in the UAE was small.  Additionally, defendant argues that Commerce considered pricing information that showed that the value added to the price of CORE by production in third countries like the UAE was approximately 10% to 31% and that the value of processing to produce CORE from CRS and HRS substrates was approximately 13% and 22%, respectively.  *Id.* at 34-35.

**PUBLIC VERSION**

These data strengthened further Commerce's determination that in this instance, [[ ]]%

and [[ ]]%, respectively, did not qualify as significant.  FAM at 2-4.

Last, defendant argues that Commerce's approach to evaluating the value of

processing was consistent with congressional intent.  Defendant points to congressional

language pertaining to the amendment of 19 U.S.C. § 1677j(b), which provides that "the

bill does not establish a rigid numerical standard for determining 'significance' nor does

the Committee expect Commerce to establish a specific numerical test."  Def. Br. at 31-

32 (citing Uruguay Round Agreements Act, S. Rep. No. 103-412, at 81-82 (1994)).

Defendant maintains that Congress instead intended for Commerce to determine

significance on a case-by-case basis and by considering the totality of the

circumstances, a standard which defendant argues that Commerce upheld in this

instance.  Def. Br. at 36.

**B.     Analysis**

In considering whether the value of the processing performed in the UAE

comprises a significant proportion of the value of the merchandise exported to the

United States, the court considers: (1) Commerce's selection and application of its

formula and, (2) Commerce's conclusion that the value was not significant.  The court

concludes that Commerce's determination that the value of the processing performed in

the UAE comprises a small proportion of the value of the merchandise imported into the

United States was supported by substantial evidence.

**PUBLIC VERSION**

Commerce provided a reasonable explanation for the formula that it used to calculate the value-added percentages.  In its Preliminary Analysis, Commerce outlined its method for the calculation of further processing costs and the value-added percentages.[4]  PAM at 4-5.  In consideration of plaintiff's argument, Commerce recalculated the percentages to include profit, financial expenses and SG&A, using company-wide profit information.  IDM at 20.  This Court has previously held — in a case challenging the final results of an administrative antidumping review issued by Commerce — that where the relevant statute provides little direction, "Commerce enjoys discretion in choosing its methodology." *NSK Ltd. v. United States,* 29 CIT 1, 17, 358 F. Supp. 2d 1276, 1291 (2005), *aff'd*, 162 F. App'x 982 (Fed. Cir. 2006).  Because section 1677j(b) does not mandate the use of a particular formula, Commerce has the ability to choose how to calculate the value-added percentages as long as its chosen methodology is reasonable and Commerce explains its choice.  Commerce is required neither to use a party's proffered and preferred methodology, nor to provide an explanation for a decision not to use an alternative methodology offered by a party.

---

[4] "Average further processing expenses are the expenses incurred by the UAE respondent, not including HRS and/or CRS input costs. . . .  The further processing costs were calculated as follows: Further Processing Cost = Total Cost (including Direct Material Cost, Labor, Manufacturing, Overhead, and Packing Costs) – Direct Material Cost of HRS or CRS Substrate."  PAM at 4.  "To determine the average further processing cost as a percentage of AGIS's U.S. sales price, Commerce compared AGIS's further processing value added to the actual value of its merchandise exported to the United States.  The value-added percentage was calculated as follows: Value-Added Percentage = Average Further Processing Cost / Average U.S. Sales Price."  *Id.*

**PUBLIC VERSION**

The statute directs this court to review whether Commerce's determination is reasonable and is supported by the record as a whole, not whether the court agrees with Commerce's chosen methodology.  *Nippon Steel Corp.,* 458 F.3d at 1351-52.  The court's review of Commerce's findings "does not demand expansive discussion or rigid adherence to a specific formula, as long as the court can determine that the statutory requirements have been satisfied."  *Nucor Corp. v. United States,* 414 F.3d 1331, 1341 (Fed. Cir. 2005).  Accordingly, the court will affirm Commerce's determination as long as Commerce used a reasonable formula that satisfies the statutory requirements under 1677j(b).  *Id.*  Here, Commerce used a formula that captured the value added by AGIS' processing in the UAE, as section 1677j(b)(1)(C) requires.  Additionally, Commerce explained its chosen methodology.  *See* PAM at 4.  Therefore, plaintiff's argument that Commerce erred in calculating the value-added percentages lacks merit.

With regard to the question of whether the value of processing in the UAE was significant, Commerce based its determination on its calculation of value-added percentages, a comparison with previous circumvention determination findings and evaluation of price data.  IDM at 11-12, 17-21; PDM at 17-23.  Based on these substantial data, Commerce reached a reasonable conclusion.

Further, Congress did not intend to create a "rigid numerical standard" for Commerce's determination of whether the value of the processing performed in the foreign country was significant under 19 U.S.C. § 1677j(b).  Uruguay Round

**PUBLIC VERSION**

Agreements Act, S. Rep. No. 103-412, at 81-82 (1994).[5]  Instead, Congress intended

for Commerce to have "flexibility in administering this standard" to be implemented on a

"case-by-case basis" and for "the new standard [to be] less difficult to meet, thereby

improving [Commerce's] ability to prevent circumvention."  *Id.* at 82.  Therefore, contrary

to plaintiff's argument, the statute does not require Commerce to provide a specific

benchmark value to delineate a finding as to whether the value of processing performed

in a foreign country is significant, nor does the statute require Commerce to conduct a

comparative analysis.

Additionally, the case cited by plaintiff, *Peer Bearing*, is not apposite.  In that

case, Commerce calculated the average unit cost of manufacturing in the third country

as 38% of the total cost of manufacturing and concluded that the 38% figure

represented *one consideration* that weighed in favor of finding that the product had

been "substantially transformed" in the third country.  *Peer Bearing*, 39 CIT at ___, 128

F. Supp. 3d at 1291; *see also Tapered Roller Bearings and Parts Thereof, Finished and*

*Unfinished, from the People's Republic of China: Final Results of the 2007-2008*

---

[5] "The Committee expects and intends that the new standard will be less difficult to meet, thereby improving our ability to prevent circumvention.  It also recognizes the need for *flexibility* in administering this standard.  Thus, the bill does not [] establish a rigid numerical standard for determining 'significance' nor does the Committee expect Commerce to establish a specific numerical test.  The determination of whether the value of the parts or components is a significant portion of the total value of the merchandise should be made on a case-by-case basis, looking at the totality of the circumstances.  However, where the proportion of the value is relatively high (e.g., the value of a television tube in relation to a finished television set), the conclusion should be clear."  Uruguay Round Agreements Act, S. Rep. No. 103-412, at 82 (1994) (emphasis supplied).

*Administrative Review of the Antidumping Duty Order*, 75 Fed. Reg. 844 (Dep't of

Commerce Jan. 6, 2010) and accompanying Issues and Decision Mem. at 10-11.

Substantial transformation and circumvention represent two distinct legal standards and

two distinct inquiries.  *Peer Bearing* involved neither a circumvention inquiry nor

Commerce's analysis of whether "the value of the processing performed in the foreign

country represents a small proportion of the value of the merchandise imported into the

United States" — the relevant factor under 19 U.S.C. § 1677j(b)(2)(E).

Finally, even if the holding in the case was apposite and even if the proffered

numbers in this case were equivalent, the *Peer Bearing* court noted that the value-

added percentage would not be "so significant as to outweigh the other factors" and that

"no single factor is dispositive."  *Peer Bearing*, 39 CIT at ___, 128 F. Supp. 3d at 1291

(citing Final Results of Redetermination Pursuant to Court Remand (Apr. 11, 2012) at

16).  In the present case, the value-added percentages calculated by Commerce — [[

]]% for CRS and [[ ]]% for HRS — are even lower than the 38% value-added percentage

in *Peer Bearing*.

In sum, even if the substantial transformation and circumvention inquiries were

comparable, it is not clear that *Peer Bearing* would weigh in favor of this court finding

that Commerce's conclusion that the relevant figures in this case were not significant

was unreasonable.  Therefore, plaintiff's second argument — that Commerce failed to

provide a rationale for its significance finding such that its determination lacked

substantial evidence — lacks merit.

**PUBLIC VERSION**

III.     **Commerce's decision to use surrogate values for a non-market economy (NME) proceeding**

A.       **Positions of the parties**

Plaintiff argues that the exports in this case are from the UAE, which is a market economy ("ME") country.  Pl. Br. at 31-34.  Accordingly, plaintiff urges an ME methodology in which Commerce uses the actual prices of inputs that plaintiff imported from China.  *Id.* at 16.  Plaintiff asserts that Commerce is not entitled to use surrogate values when purchases were made in ME countries, because those purchase prices are ME prices.  *Id.*

Plaintiff maintains that the statute requires that this proceeding be conducted as an ME proceeding, not an NME proceeding.  *Id.* at 32-34.  Plaintiff points out that section 1677j(b) pertains to "[m]erchandise completed or assembled in other foreign countries."  As a result, according to plaintiff, "merchandise" completed "in other foreign countries" in this case means the UAE, which is an ME country.  19 U.S.C. § 1677j(b)(1)(D).  Therefore, plaintiff concludes, Commerce should rely on an ME methodology and ME values from the UAE rather than an NME methodology and surrogate values from China.  Pl. Br. at 32-34.

Plaintiff asserts that Commerce's use of surrogate values here is inconsistent not only with the statute, but also with Commerce's chosen methodology and, therefore, is arbitrary.  Pl. Reply Br. at 14-15.  Plaintiff references Commerce's use of Chinese purchase prices to calculate costs under section 1677j(b)(1)(C).  *Id.* at 14.  Plaintiff then argues that for Commerce to use these values from China under section (C), only to

resist their use in another context, section (D), based on alleged unreliability,

demonstrates inconsistency.  *Id.*  Plaintiff maintains that Commerce relied on internal

Chinese prices in accordance with section 1677j(b)(1)(C) — for example, valuing the

average construction price of an integrated steel mill in China at $3.6 billion — when

analyzing the level of investment in the UAE as compared to that in China.  *Id.* at 14-15;

IDM at 17.

Plaintiff argues further that defendant's reliance upon *U.K. Carbon and Graphite*

*Co., Ltd. v. United States,* 37 CIT 1295, 931 F. Supp. 2d 1322 (2013) — a

circumvention case in which Commerce used its NME surrogate-value methodology to

value exports from an ME in which the underlying AD order pertained to exports from an

NME, China — is misplaced.  Pl. Reply Br. at 15 (citing *U.K. Carbon and Graphite*, 37

CIT at 1311-12, 931 F. Supp. 2d at 1336).  In that case, Commerce made a

determination that the actual, specific purchase prices paid by the entity in the third

country — the United Kingdom — were inherently unreliable because those purchase

prices pertained to products from China and China itself is an NME.  *U.K. Carbon and*

*Graphite*, 37 CIT at 1311, 931 F. Supp. 2d at 1336.  Here, Commerce determined that

NME prices are inherently unreliable as a general matter — Commerce did not render a

determination that the specific purchase prices that plaintiff paid to Chinese suppliers in

this case were unreliable.  IDM at 21.  Accordingly, plaintiff seeks to distinguish the

approach taken by Commerce in the instant case from the one affirmed in *U.K. Carbon*

*and Graphite*.

**PUBLIC VERSION**

Defendant admits that Commerce typically uses actual prices paid for China-produced inputs in ME proceedings, but seeks to distinguish this circumvention case as an NME proceeding.  Def. Br. at 40.  Defendant notes first that Commerce initiated this circumvention proceeding under the China CORE investigation, and the proceeding concerns China-produced merchandise.  *Id.*  Commerce seeks to determine whether Chinese-produced merchandise is being sold to the United States in circumvention of the *2016 CORE Orders*.  *Id.*  As a result, defendant claims that, on its face, this is an NME proceeding.  *Id.*

Defendant claims that the use of surrogate NME values in antidumping duty proceedings involving imports from ME countries is a well-established practice of Commerce.  *Id.* at 38-40.  In its Final Determination, Commerce stated that the analysis of the input costs at issue here "appropriately falls under the purview of Commerce's NME methodology, which by statute presumes that NME costs and prices are inherently unreliable."  IDM at 21.  Defendant notes that Commerce used surrogate value methodology in *U.K. Carbon and Graphite.*  Def. Br. at 39-40 (citing *U.K. Carbon and Graphite*, 37 CIT 1295, 931 F. Supp. 2d 1322).  In that case, product inputs from China were completed in an ME country — the United Kingdom, like the UAE in this case — and Commerce used surrogate values for an NME country.  Def. Br. at 39-40.

**B.    Analysis**

Commerce's decision to use surrogate values and the manner in which it computed those values in the circumvention analysis was reasonable and supported by

**PUBLIC VERSION**

substantial evidence for two reasons.  First, Commerce's decision to treat this

proceeding as an NME proceeding rather than an ME proceeding was reasonable.

Second, Commerce's interpretation of the "value" determination was reasonable.

Turning first to Commerce's decision to treat this proceeding as an NME

proceeding, Commerce decision was reasonable because the orders that Commerce

was seeking to enforce are from China.  The subject merchandise in this case was

CORE produced in China.  IDM at 1.  China, as noted, is an NME country.  *Id.* at 21.

Plaintiff argues that the goods were being manufactured or assembled in an ME

country and, accordingly, Commerce should have used an ME methodology.  Pl. Br. at

31-34.  Commerce noted that this proceeding involved circumvention proceedings

initiated under the *2016 CORE Orders*, which are NME proceedings.  PDM at 8.  In its

IDM, Commerce asserted that "analysis of [AGIS'] Chinese-origin input costs

appropriately falls under the purview of Commerce's NME methodology, which by

statute presumes that NME costs and prices are inherently unreliable."  IDM at 21.  In

light of China's status as an NME and in light of the fact that these circumvention

proceedings were initiated under the *2016 CORE Orders* (NME proceedings),

Commerce's decision to treat this proceeding as an NME proceeding was reasonable.

Moreover, this Court has sustained Commerce's use of surrogate values in

previous circumvention inquiries involving merchandise assembled in an ME country,

because the decision to do so reflects Commerce's reasonable construction of the

statute.  *See U.K. Carbon and Graphite*, 37 CIT at 1312, 931 F. Supp. 2d at 1336.

**PUBLIC VERSION**

Defendant notes accurately that in *U.K. Carbon and Graphite*, Commerce used surrogate values for NME Chinese inputs when production was completed in an ME country, the United Kingdom — circumstances that are comparable to the facts in this case.  Def. Br. at 39-40; *U.K. Carbon and Graphite*, 37 CIT at 1311-12, 931 F. Supp. 2d at 1336.  In that case, Commerce used surrogate values from Ukraine to value Chinese inputs and the court held that Commerce's decision to use a surrogate value methodology in determining the value of inputs from an NME country represented a reasonable construction of the statute.  *U.K. Carbon and Graphite*, 37 CIT at 1312, 931 F. Supp. 2d at 1336.

Plaintiff seeks to distinguish *U.K. Carbon and Graphite* on the grounds that there, Commerce found that the *actual prices paid* in the third country for Chinese products were unreliable, whereas here, Commerce noted that NME prices *in general* were unreliable.  *Id.* at 1311, 931 F. Supp. 2d at 1336; Pl. Reply. Br. at 15; IDM at 21.  *U.K. Carbon and Graphite* does not support plaintiff's argument.  In that case, the court found that surrogate values from Ukraine were reasonably used to value Chinese inputs.  *U.K. Carbon and Graphite*, 37 CIT at 1312, 931 F. Supp. 2d at 1336.  Commerce found it reasonable to use surrogate values from Ukraine there because Commerce said that costs and prices from an NME are "inherently unreliable."  *Id.* at 1299, 931 F. Supp. 2d at 1327.  In that case, Commerce looked at the specific prices involved and declared them unreliable.  Plaintiff argues that, in contrast, here, Commerce declared that NME prices *in general* are unreliable because they came from China.  Pl.'s Reply Br. at 15.

Plaintiff's argument is based on highlighting a distinction without a difference and is, therefore, unpersuasive.  Commerce's decision to use surrogate values in an NME proceeding was reasonable, within its discretion and aligned with precedent.

In addition, Commerce's interpretation of the "value" determination was reasonable.  Section 1677j(b)(1)(D) instructs that one basis for Commerce to find that an order was being circumvented is that "the *value* of the merchandise produced in the foreign country to which the antidumping duty order applies is *a significant portion* of the value of the merchandise that was exported to the United States . . . ."  19 U.S.C. § 1677j(b)(1)(D) (emphasis supplied).

Section 1677j(b)(1)(D) does not define how Commerce is to determine "value." *Id.*; *see also* Def. Br. at 37-38.  This statutory ambiguity shows that Congress left a gap for the agency to fill.  The delegation of interpretive power to Commerce is bolstered by its greater expertise than courts in determining valuation methodologies.  *See Consumer Prods. Div., SCM Corp. v. Silver Reed Am., Inc.*, 753 F.2d 1033, 1039 (Fed. Cir. 1985); *Thai Pineapple Pub. Co. v. United States*, 187 F.3d 1362, 1365 (Fed. Cir. 1999).  Given the lack of definition of "value" and silence as to the method to use to assess "value," Commerce acted reasonably.

## IV.    Commerce's consideration of the pattern of trade

### A.    Positions of the parties

Plaintiff argues that Commerce did not consider adequately the pattern of trade in its determination.  Pl. Br. at 34-37.  Specifically, plaintiff alleges that Commerce acted

arbitrarily and contrary to law in limiting its analysis to only the two 49-month periods

before and after the initiation of the investigations that led to the *2016 CORE* Orders.

*Id.* at 34.  Plaintiff argues that section 1677j(b)(3)(A) does not identify specific

parameters on which Commerce must rely in its selection of time periods.  *Id.*  Because

Commerce limited its analysis to only a single set of time periods and not the other time

periods proposed by plaintiff, plaintiff alleges that Commerce "cherry picked" time

periods that were likely to support an affirmative determination of circumvention.  *Id.*

The time periods proposed by plaintiff reveal data that support the finding that AGIS did

not shift shipping and sourcing patterns in response to the *2016 CORE Orders*.  *Id.* at

34-35.

Plaintiff argues that AGIS' annual increase in shipment volume began prior to the

issuance of the *2016 CORE Orders,* reflecting "natural upward progression of . . . a

growing and expanding company."  *Id.* at 35.  Moreover, plaintiff points out that its

shipments to the United States of CORE produced with Chinese HRS or CRS

substrates have decreased since the issuance of the *2016 CORE Orders*.  *Id.*  Further,

since December 2017, AGIS has not shipped any CORE products with Chinese HRS or

CRS substrates to the United States.  *Id.*  Additionally, plaintiff points to AGIS' patterns

of sourcing Chinese HRS and CRS.  *Id.* at 37.  According to plaintiff, these patterns of

sourcing show that, since June 2011, Chinese-origin HRS and CRS substrates

purchases comprised only [[ ]]% of the total steel substrate purchased by AGIS and that

AGIS' semi-annual steel purchases from China have declined since the issuance of the

*2016 CORE Orders*.  *Id.*  In sum, plaintiff argues that it was unreasonable for Commerce to rely upon only a single pattern of trade that was "contradicted and overshadowed" by other patterns of trade.  Pl. Reply Br. at 19.[6]

Defendant argues that Commerce's consideration of the pattern of trade was reasonable and that prior decisions of this Court and prior Commerce determinations support its approach.  Def. Br. at 41-44.  Defendant submits that Commerce selected the symmetrical 49-month periods for the purpose of comparing data from before and after Commerce initiated the underlying antidumping and countervailing duty investigations on CORE from China.  *Id.* at 41.  Defendant asserts that this selection is consistent with Commerce's examination of time periods in other cases.  *Id.* at 43 (citing China/Vietnam CORE IDM at 47-48); *see also Taiwan/Vietnam CORE Final Determination* and accompanying Taiwan/Vietnam CORE IDM.  For example, in a circumvention inquiry with regard to CORE produced in Vietnam using HRS and CRS from China, Commerce compared pattern of trade data using periods of time identical in length and bifurcated by the initiation of the CORE investigations.  *See* China/Vietnam CORE IDM at 47.  Similarly, in a circumvention inquiry with regard to CORE produced in Vietnam using HRS and CRS from Taiwan, Commerce compared periods of time before

---

[6] At oral argument, plaintiff expanded on its argument and claimed that Commerce's analysis of pattern of trade was arbitrary for two reasons.  First, Commerce looked at only a single pattern of trade and did not consider any of AGIS' suggested patterns of trade.  Oral Argument Tr. at 42, ECF Nos. 57, 58.  Second, and relatedly, Commerce used identical time periods for its analyses under both section 1677j(b)(3)(A) and section 1677j(b)(3)(C), resulting in the consideration of the same information under both sections of the statute.  *Id.*

**PUBLIC VERSION**

and after Commerce initiated circumvention inquiries on the AD and CVD orders of

CORE from China.  *See* Taiwan/Vietnam CORE IDM at 9-10.  In addition, defendant

argues that Commerce's choice is entitled to deference because it represented a

reasonable interpretation of the statute, which is silent as to the particular method to be

used.  Def. Br. at 42-43 (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467

U.S. 837, 843-44 (1984)).

Defendant argues also that Commerce's decision was reasonable, even after

considering AGIS' decrease in exports.  Commerce found that AGIS shipped CORE

containing Chinese HRS and CRS substrates to the United States until December 2017,

more than a year after the orders were published and nearly two years after the

investigations began.  *Id.* at. 43-44.  Defendant maintains that Commerce therefore

considered the decrease in AGIS' exports to the United States after December 2017 but

discounted this decrease in light of the shipments that increased after the investigations

were commenced and the orders entered.  *Id.*

    **B.    Analysis**

The court concludes that Commerce's consideration of the pattern of trade was

reasonable.  Section 1677j(b)(3)(A) does not mandate the use of a specific time period

to analyze the pattern of trade.  As defendant correctly points out, when the statute is

silent as to the use of a particular method, "Congress has explicitly left a gap for the

agency to fill."  Def. Br. at 42-43 (citing *Chevron*, 467 U.S. at 843-44).  Because the

**PUBLIC VERSION**

statute is silent with regard to selection of time period here, Commerce's selection is

entitled to deference.

Commerce's selection of time periods to analyze was reasonable and in

accordance with law because the time periods were based on critical dates in the

investigation, IDM at 13, and these periods comported with prior practice, as

demonstrated through comparison to previous Commerce decisions.  In previous

circumvention inquiries of CORE products with Chinese-origin substrate, Commerce

similarly selected time periods centered symmetrically around the initiation date of the

underlying investigations.  *See, e.g.,* Taiwan/Vietnam CORE IDM; China/Vietnam

CORE IDM.

Commerce is required to "explain the basis for its decisions; while its

explanations do not have to be perfect, the path of Commerce's decision must be

reasonably discernable to a reviewing court."  *NMB Singapore Ltd. v. United States*, 557

F.3d 1316, 1319 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.

Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  In this case, Commerce provided a reasonable

explanation for its selection of the two 49-month time periods upon which it based its

decision on the pattern of trade.  Commerce provided the following explanation for its

decision:

> Contrary to AGIS's claim that the period was arbitrarily set, the period keys off the
> initiation of the underlying investigations and also takes into account the date of
> the preliminary determination in the AD investigation. These periods allowed
> Commerce to compare the trade patterns prior to the discipline of any AD and CV
> duties with the trade patterns present when parties were aware that they could
> potentially have to pay AD and CV duties.

**PUBLIC VERSION**

Court No. 20-00142                                                      Page 45

IDM at 13.

Additionally, section 1677j(b)(3)(A) does not mandate the consideration of any specific data in Commerce's evaluation of the pattern of trade.  Rather, the statute sets out "the pattern of trade, including sourcing patterns," as one of multiple "[f]actors to consider."  19 U.S.C § 1677j(b)(3)(A).

In this instance, Commerce considered country-wide sourcing patterns by comparing the average monthly volume of imports of CRS and HRS substrates from China into the UAE before and after the initiation of the CORE investigations.  IDM at 12.  Commerce considered also AGIS-specific sourcing patterns by comparing the quantity of purchases of Chinese origin CRS and HRS substrates before and after initiation.  PAM at 7.  Once Commerce analyzed sourcing patterns, Commerce completed its duty under the statute and was not mandated to factor in AGIS' proposed data in its analysis of the pattern of trade.  *See* 19 U.S.C § 1677j(b)(3)(A).

 The data submitted by plaintiff show a decrease in the use of Chinese substrate following the issuance of the *2016 CORE Orders* and an eventual end to the importation of CORE products using Chinese-origin substrate into the United States.  Pl. Br. at 34-35.  However, as discussed, Commerce's analysis of pattern of trade was reasonable and in accordance with the law.  Therefore, Commerce's determination that the pattern of trade weighed in favor of an affirmative determination of circumvention was supported by substantial evidence on the record.

**PUBLIC VERSION**

## CONCLUSION

*The Deer Hunter*,[7] the masterful 1978 motion picture about the impact of the

Vietnam War on the lives of a group of people — in particular, the lives of a handful of

steel workers — is set in Clairton, Pennsylvania, approximately 15 miles southeast of

Pittsburgh, situated on the Monongahela River in the southeast corner of Allegheny

County.[8]  The film's sequences in the United States are set against the backdrop of a

Russian Orthodox Cathedral[9] and giant steelworks.[10]

The opening scene features an oiler, belching smoke, barreling downhill under a

highway overpass, around a bend and past a small gas station.  The streets are wet

and littered with leaves.  It is dawn, streetlamps lit against an overcast sky, smoke from

the steelworks wafting up into steely gray clouds, heavy with rain.

The film cuts to inside the mill.  The workers, in metal coats, are surrounded by

fire and molten material, heavy equipment.  Sparks fly everywhere.  The men's faces,

when unmasked, are drenched in sweat.

---

[7] THE DEER HUNTER (EMI Films/Universal Pictures 1978).  The film was nominated for nine Academy Awards, winning five: Best Picture, Best Director, Best Supporting Actor, Best Film Editing and Best Sound.  *See The Deer Hunter*, WIKIPEDIA, https://en.wikipedia.org/wiki/The_Deer_Hunter (last visited Sept. 17, 2021).

[8] *See The Deer Hunter*, WIKIPEDIA, *supra* note 7; *Clairton, Pennsylvania*, WIKIPEDIA, https://en.wikipedia.org/wiki/Clairton,_Pennsylvania (last visited Sept. 17, 2021).  The scenes were actually filmed on location in Weirton, West Virginia, Steubenville, Ohio, and Struthers, Ohio, and at the U.S. Steel Central Furnaces in Cleveland, Ohio.  *See The Deer Hunter*, WIKIPEDIA, *supra* note 7.

[9] St. Theodosius Russian Orthodox Cathedral in Cleveland, Ohio.  *See The Deer Hunter*, WIKIPEDIA, *supra* note 7.

[10] *See id.*

**PUBLIC VERSION**

The night shift ends and they go to the locker rooms.  Three of the leads — Mike Vronsky (Robert De Niro), Nick Chevotarevich (Christopher Walken, who won an Academy Award for Best Supporting Actor for the role) and Steven ("Stevie") Pushkov (John Savage) — are getting man hugs, slaps on the back, well wishes from the other shift workers.

As Mike, Nick and Stevie make their way through the locker room and out, they are joined by Stan (John Cazale, who died three months after filming completed from terminal bone cancer, friend and co-star Meryl Streep at his side throughout and at his death) and Axel (Chuck Aspegren).  We learn that it is Stevie's wedding night, that his bride, Angela (Rutanya Alda), is pregnant, and that Mike and the other guys are going deer hunting that night.

They go to the bar run by John Welsh (George Dzundza), who bolts out of the kitchen, apron on, to greet them, bear hugs Stevie from behind and, in nearly Tigger-like fashion, bounces him around the bar in celebration: "Drinks are on the house!"  Football is on the TV, there is Steelers - Eagles banter, mugs of beer and Rolling Rocks everywhere, they shoot pool.  Frankie Valli's *Can't Take My Eyes off You* booms out from the speakers.[11]

\* \* \*

---

[11] Frankie Valli, *Can't Take My Eyes off You*, on Frankie Valli: Solo (A & R Recording Inc. 1967).

**PUBLIC VERSION**

For the reasons stated above — which, the court hopes, have been elucidated with sufficient amplification — Commerce's Final Determination was reasonable and in accordance with law.  As such, the court sustains Commerce's Final Determination and denies plaintiff's motion for judgment upon the agency record pursuant to USCIT Rule 56.2.  Judgment will enter accordingly.

/s/      Timothy M. Reif
Timothy M. Reif, Judge

Dated: September 24, 2021
         New York, New York